## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| HAROLD S. CROCKER, JR. and ANNA BODNAR, on behalf of themselves and others similarly situated, | Civil Action No.: 4:09-cv-0198-CEJ |
| Plaintiffs, | Judge Carol E. Jackson |
| v. | Class Action |
| KV PHARMACEUTICAL, MARK S. HERMELIN, RONALD J. KANTERMAN, DAVID S. HERMELIN, MELISSA HUGHES, RICHARD H. CHIBNALL, GERALD R. MITCHELL, MARY ANN TICKNER, THOMAS TOMARO, and DOES 1-20, | |
| Defendant. | |

## CONSOLIDATED AMENDED COMPLAINT

## INTRODUCTION

Plaintiffs Harold S. Crocker, Jr. and Anna Bodnar, participants in the KV Pharmaceutical Company Fifth Restated Profit Sharing Plan and Trust ("Plan"), bring this action, individually and on behalf of participants and beneficiaries of the Plan and all others similarly situated, to recover losses incurred by the Plan. Plaintiffs seeks to recover millions of dollars in losses arising from the imprudent purchase and investment in the common stock of KV Pharmaceutical Company ("KV" or "Company") by fiduciaries of the Plan who knew or should have known that KV's books and records did not accurately reflect its financial condition and that KV had not properly disclosed its financial condition to the public. Plaintiffs seek to represent all participants in or beneficiaries of the Plan (the "Participants") whose individual Plan accounts were invested in KV Class A common stock and/or KV Class B common stock ("KV Stock" or

"Company Stock") at any time between February 2, 2003 through the present (the "Class Period").[1] Excluded as proposed class members are any of the named Defendants, members of their immediate families, and their heirs, successors or assigns.

## NATURE OF ACTION

1.      This class action asserts claims under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), seeking to recover losses incurred by the Plan, for the benefit of participants and beneficiaries of this Plan, arising from the investment of Plan assets in Company Stock when Defendant-fiduciaries knew or should have known that KV's books did not accurately reflect its deteriorating condition and that KV had not made required disclosures to the investing public (which included Plan Participants) of material information regarding its deteriorating financial condition.  Defendants breached their fiduciary duties by causing the Plan it to purchase, allocate and or continue to invest in the Company's shares when they knew or should have known that KV's books and failure to make required disclosures of accurate and material information to the investing public had artificially inflated KV share prices.  Plaintiffs further seek equitable relief under ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) to the extent that it is needed to protect the interests of the Plan and its Participants.  Plaintiffs request, among other things, a restoration of losses to the Plan which, once restored, would be allocated to and distributed among current and prior accounts maintained by Class members during the Class Period.

2.      Defendants were ERISA fiduciaries of the Plan during the Class Period.  Their responsibilities included, *inter alia*, selecting and/or monitoring the fiduciaries of the Plan; prudently selecting and monitoring investment of the Plan's assets; selecting appropriate

---

[1]  On July 7, 2008, 37,767,037 shares of KV Class A common stock and 12,163,482 shares of Class B common stock were outstanding. These constitute all outstanding KV voting shares.

investment options, which required them to determine whether Company Stock was an appropriate investment option; and providing other fiduciaries and participants with complete and accurate information material to the decision whether to invest Plan assets in KV Stock. As ERISA fiduciaries, Defendants were obligated to act prudently and solely in the interests of the Plan and its Participants.

3.      As set forth below, Defendants who were investment fiduciaries of the Plan breached their fiduciary duties by causing Plan assets to be invested in Company Stock when they knew or should have known that such an investment was imprudent. Defendant fiduciaries knew or should have known that KV's books did not accurately reflect its financial condition and that KV was not disclosing to the investing public its significant financial problems, conduct which these fiduciaries knew or should have known artificially inflated the value of Company Stock at the same time that the Plan was buying shares of KV Stock at market prices. Among other things, KV and other Defendants failed to disclose that:

(1)      KV's manufacturing facilities and procedures were not in material compliance with applicable regulations;

(2)      KV financial statements were not in material compliance with applicable regulations and accounting standards;

(3)      KV failed to maintain sufficient management controls to timely address problems; and

(4)      Defendants undermined the Company's integrity with the investing public when the Company was insolvent or insolvency was imminent.

## JURISDICTION AND VENUE

4.      As This action is brought pursuant to the civil enforcement provisions of ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) and (a)(3).  The Court has subject matter jurisdiction pursuant to ERISA § 502(e)(1), 29 U.S.C.§ 1132(e)(1), as well as 28 U.S.C. § 1331.

5.      Since ERISA § 502(e)(2), 29 U.S.C.§ 1132(e)(2), provides for nationwide service of process and all Defendants reside in the United States, this Court has personal jurisdiction over them.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, many of the fiduciary breaches complained of took place in this District, there is ongoing securities litigation which involves overlapping factual issues that have already been filed in this district, and Defendant KV Pharmaceutical, Inc. is headquartered in this District.

## PARTIES

7.      **Plaintiff Harold S. Crocker, Jr.**  Mr. Crocker is a resident of Ceder Hill, Missouri who has worked for KV for more than 23 years.  He is a participant in the Plan, and held KV company stock in the Plan.

8.      **Plaintiff Anna Bodnar.**  Ms. Bodnar is a resident of St. Charles, Missouri who worked for KV for more than 10 years.  She is a participant in the Plan, and held KV company stock in the Plan.

9.      **Defendant KV Pharmaceutical Co. ("KV" or the "Company").**  KV is a specialty pharmaceutical company that develops, manufactures, acquires, and markets branded and generic/non-branded prescription pharmaceutical products.  KV is headquartered in Brentwood, Missouri.  According to the Form 5500 filed with the United States Department of Labor and the Internal Revenue Service for fiscal year 2008, KV is the Sponsor of the Plan.

10.  **Defendant Marc S. Hermelin.**  Marc S. Hermelin served as Chairman of the Board of KV (the "Board") as well as Chief Executive Officer ("CEO") until December 2008, when he was terminated for cause.  He continues to serve on the Board of Directors, as he has done since 1973.  Mr. Hermelin served as an officer and director during the relevant Class Period.  According to KV's Human Resources Policies and Procedures: Senior Executives Code of Ethics, as written in June 2004 (the "Code of Ethics"), as KV's CEO, Defendant M. Hermelin was required to:

- Produce full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company or its subsidiaries files with, or submits to, the [SEC] and other regulators and in other public communications made by the Company of its subsidiaries;

- Comply with applicable governmental laws, rules, and regulations, as well as the rules and regulations of self-regulatory organizations with which the Company, its subsidiaries, or its securities are associated; and

- Promptly report any possible violations of KV's Code of Ethics to the Corporate Compliance Officer.

11.  **Defendant Ronald J. Kanterman.**  Ronald Kanterman has served on the Board since March 26, 2008, and as Vice President, Chief Financial Officer ("CFO"), Treasurer, and Assistant Secretary since March 23, 2008.  Mr. Kanterman has been a Vice President of the Company since he joined the company in 2004.  Mr. Kanterman served as a Director and Officer during the relevant Class Period.  Upon information and belief, Mr. Kanterman is a member of a committee of KV executives and employees that administered the Plan and serves as a Plan fiduciary that exercises authority and control over Plan assets and/or manages and administers the Plan.

12. **Defendant David S. Hermelin.** David Hermelin served as a Director and Vice President until he resigned in December of 2008. He continues to serve on the Board of Directors. Mr. Hermelin served as a Director and Officer during the relevant Class Period.

13. **Defendant Gerald R. Mitchell.** Gerald R. Mitchell is the Chief Financial Officer of KV and is a member of the Board of Directors. Upon information and belief, he is a member of a committee of KV executives and employees that administered the Plan and serves as a Plan fiduciary that exercises authority and control over Plan assets and/or manages and administers the Plan. Mr. Mitchell also signed the 11-K filed on September 27, 2006 and September 27, 2007 on behalf of the trustees or other persons who administer the Plan.

14. Defendants Marc Hermelin, Kanterman, David Hermelin, and Mitchell are herein referred to as the "Director Defendants."

15. **Defendant Richard H. Chibnall.** Richard Chibnall has been Vice President, Finance and Chief Accounting Officer of KV since June 2005, and served as Vice President, Finance of KV from February 2000 through June 2005. Upon information and belief, he is a member of a committee of KV executives and employees that administered the Plan and serves as a Plan fiduciary that exercises authority and control over Plan assets and/or manages and administers the Plan. Mr. Chibnall also signed the 11-K filed on September 30, 2008 on behalf of the trustees or other persons who administer the Plan.

16. **Defendant Melissa Hughes.** Melissa Hughes has been the Director of Human Resources of KV Pharmaceutical since at least January 2006. Upon information and belief, she was a member of a committee of KV executives and employees that administered the Plan and serves as a Plan fiduciary that exercises authority and control over Plan assets and/or manages and administers the Plan.

17.  **Defendant Mary Ann Tichner.**  Mary Ann Tichner is or was an employee of KV.  Upon information and belief, she was a member of a committee of KV executives and employees that administers the Plan and serves as a Plan fiduciary that exercises authority and control over Plan assets and/or manages and administers the Plan.

18.  **Defendant Thomas Tomaro.** Thomas Tomaro is or was an employee of KV.  Upon information and belief, he was a member of a committee of KV executives and employees that administered the Plan and serves as a Plan fiduciary that exercises authority and control over Plan assets and/or manages and administers the Plan.

19.  Defendants Kanterman, Mitchell, Chibnall, Hughes, Tichner and Tomaro are hereinafter referred to collectively as the "KV Plan Committee Defendants."

20.  **Defendants DOES 1-20**.  DOES 1-20 are additional fiduciaries of the Plan and include the individuals who administer the Plan and other named and *de facto* investment fiduciaries. The exact identities and fiduciary functions of these individuals will be ascertained through discovery.  The information and documents on which Plaintiff's claims are based are, for the most part, solely within the Defendants' possession and control.  Therefore, to the extent necessary or appropriate in light of discovery, Plaintiff will amend the Complaint or seek leave to amend to add such other fiduciaries as Defendants.

## FACTUAL ALLEGATIONS

### The Plan

21.  The Plan is an "employee pension benefit plan" within the meaning §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. §1002(2)(3) and 1002(2)(A).

22.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that separate individual Plan accounts are maintained for each participant based upon the amount contributed to each participant's account.

23.     According to the 2008 Form 11-K, the Plan was established for the benefit of all employees of KV, ETHEX Corporation, Ther-Rx Corporation, and Particle Dynamics, Inc. to offer those employees a means of savings funds, on a pretax basis or after-tax basis, for retirement.[2]

24.     At all relevant times, the Plan was maintained under the KV Pharmaceutical Company Fifth Restated Profit Sharing Plan & Trust, Amended and Restated as of January 1, 2002 ("2002 Plan Document").

25.     Although KV is the named Administrator of the Plan, the Plan was also administered by Fidelity Management Trust Company pursuant to a Fidelity Advisor 401(k) Premium Service Plan Service Agreement, the latest of which was entered into on September 15, 2008 ("Service Agreement").

26.     ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description ("SPD"), the latest version of which for the Plan was dated February 4, 2009.

27.     Full-time employees are eligible to participate in both the Deferral Contribution and Matching Employer Contribution benefits of the Plan upon completion of one year, or 1,000 hours of service, for the Company and upon reaching 21 years of age.  (2002 Plan Document

---

[2]  In addition to its comprehensive research & development and manufacturing processes, KV has broad marketing and sales capabilities through its three wholly subsidiaries, Ther-Rx Corporation (established in 1999 to market brand name pharmaceutical products which incorporate KV's proprietary technologies), ETHEX Corporation (established in 1990 to develop and market heard-to-copy generic/non-branded pharmaceuticals), and Particle Dynamics, Inc. (established to develop and market specialty raw material products for the pharmaceutical, nutritional, food, personal care and other industries.).

§ 1.04(b)). Each employee may become a participant of the Plan on the first pay period coinciding with, or following, the fulfillment of the eligibility requirements. (2002 Plan Document § 1.04(d)).

28. Plan participants may contribute up to 14% of their covered compensation, up to the maximum allowable under Internal Revenue Code. (2002 Plan Document § 1.07 (a)(1) at KVE 000106). These contributions are allocated as directed by the participant. (2002 Plan Document § 1.123(b)).

29. The Company matches 50% of a participant's contribution not to exceed 7% of a participant's covered compensation. (2002 Plan Document § 1.10 (a)(1)(C)(i). Participants become fully vested in such matching contributions gradually over a 6-year period. (2002 Plan Document § 1.15 (b)(2) at KVE 000119). These contributions are allocated as directed by the participant. (2002 Plan Document § 1.23(b)).

30. In addition, the Company may also make a profit sharing contribution on a discretionary basis on behalf of all eligible Plan participants, whether or not participants make an elective contribution for the Plan year. (2002 Plan Document § 1.11(b) and attached Amendment thereto). Profit sharing contributions are based on the Company's profitability and are allocated to participant accounts based on compensation levels. (Id.) These contributions are 100% participant directed. (2002 Plan Document § 1.23(b)). Participants become 100% vested after five years, with no vesting prior to such time. (2002 Plan Document § 1.15(b)(1)).

31. There are approximately 27 investment options under the Plan, one of which is the KV A Stock Fund. (Id., Service Agreement Appx. A, 1. Mutual Fund Options). In fact, according to the Company's 2008 Form 5500, approximately 22% of the Plan's total assets were invested in KV Stock. According to the Company's 2008 Form 11-K, as of March 31, 2008, the

Plan held 703,582 shares of KV common stock – Class A and 157,328 shares of KV common stock – Class B, valued at $10,250,828 and $2,023,458, respectively. As of January 27, 2008, the value of such holdings declined to $323,647.72 and $92,823.52, respectively.

## KV's Fiduciary Status

32.    As Plan Sponsor, KV is a named fiduciary of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). KV is also the Plan Administrator of the Plan. 2007 DOL Form 5500. As Plan Sponsor, Plan Administrator and fiduciary, Defendant KV was responsible for selecting investment options or alternatives in the Plan and retained the right to change or remove any investment option. KV was responsible for monitoring the performance of the Plan's investment funds, including the KV Stock fund. These were part of KV's fiduciary functions under ERISA, pursuant to DOL regulations. 29 C.F.R. § 2509.75-8 (D-4).

33.    At all applicable times, KV exercised control over the activities of its directors, officers, and employees, including control over their activities related to the Plan. Through the Board or otherwise, KV had authority and discretion to hire and terminate its officers and employees. In addition, upon information and belief, KV had authority and discretion to appoint, monitor, and remove individual Company directors, officers, and employees as fiduciaries of the Plan. Accordingly, the actions of the Director Defendants, the Executive Defendants, and the Plan Committee Defendants are imputed to KV under principles of agency and the doctrine of *respondeat superior,* and KV is liable for such actions.

34.    KV also had the fiduciary duty to appoint, and hence a duty to monitor and if warranted, remove, the Trustee, and to execute Trust documents with the Trustee for providing investment, management, and control of Plan assets.

35.     KV also acted as a fiduciary in connection with dissemination of Plan communications to Plan Participants.  KV made direct representations to Plan Participants relating specifically to Plan investment options, KV's business and financial condition, and the merits of investing Plan assets in KV Stock. Those representations were intended to provide Plan Participants with information that was material and necessary for them to manage their Plan accounts.

36.     Upon information and belief, KV was responsible for disseminating an SPD of the Plan to Participants. Upon information and belief, KV was also responsible for disseminating to Participants the Plan prospectus ("Prospectus"), which purported to describe the investment characteristics of the Plan's various investment options. The Prospectus and all information contained or incorporated in it were representations disseminated to participants by KV in its fiduciary capacity and upon which Participants were entitled to rely in managing their accounts and investment in Plan assets.

37.     KV's SEC filings, including but not limited to, annual reports (Form 10-Ks), quarterly reports (Form 8-Ks) and Registration Statements (Form DEF14-As), were part of the SPD and Prospectus.  KV had control of and exercised discretion over the contents of the SPDs and the Prospectuses it disseminated.  These documents were intended to communicate information necessary for Plan participants to manage their Plan accounts.

38.     Under ERISA, KV was not required to cause the Plan to offer KV Stock as an investment option or to incorporate KV's SEC filings into the Plan documents.  However, by virtue of doing so, the disclosures in KV's SEC filings became representations made in a fiduciary capacity.

**Director Defendants' Fiduciary Status**

39.     According to the Company's Corporate Governance Guidelines, as adopted by the KV Board of Directors ("Board") on June 22, 2008, the Board is the ultimate decision making body of KV.  KV's business is conducted by employees and Officers under the direction of CEO, Defendant Mark. Hermelin, subject to Board oversight.

40.     Throughout the Class Period, the Director Defendants, in their capacities as Board members, were fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets and/or had discretionary authority or discretionary responsibility in Plan administration.

41.     In addition, the Director Defendants were fiduciaries of the Plan because they issued Plan communications to Plan participants by signing SEC filings that were specifically incorporated into Plan documents. Indeed, the Director Defendants signed the Form 10-Ks filed with the SEC on March 26, 2008 and June 27, 2008 on behalf of KV in their capacities as Directors. Defendants Mark Hermelin (as Principal Executive Officer) and Kanterman (as Principal Financial Officer) also signed 10-Ks on behalf of KV.  Further, because the Company is the Plan Administrator, and the Company has made no formal delegations of ERISA fiduciary responsibilities as Plan Administrator, the Board is responsible for carrying out the Plan's duties as Plan Administrator.

**Fiduciary Status of the KV Plan Committee Defendants**

42.     The KV Plan Committee Defendants were fiduciaries of the Plan under ERISA § (21)(A), 29 U.S.C. § 1002(21)(A), in that each member had discretionary authority and control

regarding the administration and management of the Plan and/or Plan assets, and possessed the full authority in their absolute discretion to determine all questions of eligibility for entitlement to Plan benefits. The KV Plan Committee was also responsible for selecting, evaluating, monitoring, and altering investment alternatives offered by the Plan.

**The Hermelin Family's Control of KV**

43.     KV's predecessor was founded in 1942 by Victor Hermelin.  As of July 7, 2008, Victor Hermelin's family, as individuals or through family trusts, owned 14.3% of Class A shares and 89.2% of Class B shares.  Because Class A shares have only one-twentieth the voting power of Class B shares, the Hermelin family has voting control over Company operations. (Definitive Proxy Statement, filed on July 29, 2008.)

44.     Many of KV's top executives are Hermelin family members.  Since the late 1970s through December 5, 2008, Victor Hermelin's son, Defendant Marc S. Hermelin, has been KV's CEO.  Until early December 2008, KV employed Marc Hermelin's wife, Sarah R. Weltscheff, as Senior Vice President, Human Resources Management and Corporate Communications, and Marc Hermelin's son, Defendant David S. Hermelin, as Vice President of Corporate Strategy and Operations Analysis.  Id.  Until January 2006, Marc Hermelin's brother-in-law, Mitchell I. Kirschner, served as Vice President, New Business.  (Definitive Proxy Statement, filed on July 7, 2007; "KV Pharmaceutical's New CEO Seeks to Rebuild Company's Reputation," St. Louis Beacon, December 21, 2009.)

45.     For the fiscal year ending March 31, 2008, Defendant Marc Hermelin received $8.66 million in total compensation, including salary and change in pension value and other payments; Sarah Weltscheff was paid $517,374 in salary, bonus, and compensation and exercised stock options with a realized value of $1.24 million; and Defendant David S. Hermelin

was paid $378,752 in salary, consulting fees, and other compensation.  (2008 Proxy Statement at

p. 17.)  Kirschner earned over $308,000 in salary during the last complete fiscal year he worked.

46.    Founder Victor Hermelin remained on KV's payroll until his death at age 95 on

May 11, 2009.  For the fiscal year ending March 31, 2008, he received salary and other

compensation totaling $313,669.  (Id.; Consulting Agreement filed as Exhibit 10.KK to Form 10-

K for the period ending March 30, 2000).

**FDA Enforcement Actions against KV Prior to Class Period**

47.    Since the mid-1990s, KV has been the subject of various actions by a number of

government agencies.

48.    On April 21, 1993, the Federal Drug Administration (FDA) instituted a civil

seizure action involving essentially all of the Company's solid oral dosage form drug products.

49.    On June 14, 1993, the Company entered into a Consent Decree with the FDA,

which settled the seizure action and required KV to engage current Good Manufacturing

Processes ("cGMP") experts to certify that KV's facilities are operated and its products were

manufactured in conformity with cGMP.  (Form 1994 10-K, filed June 29, 1995, at p. 8).

50.    On April 6, 1995, the Company entered into a plea agreement with the U.S.

Department of Justice ("DOJ") under which it agreed to plead guilty to (a)  two misdemeanor

violations of the Federal Food, Drug and Cosmetic Act involving failure to file certain required

reports with the FDA in 1991 regarding two lots of an erythromycin oral suspension product it

previously manufactured and (b)  two misdemeanor counts involving shipment of two lots of the

same product, which had been inappropriately labeled as to shelf life.  Under the plea agreement,

the Company agreed to pay a fine of $500,000 and costs of $100,000 in installments of $75,000

every six months over 3 1/2 years, beginning at sentencing.  (Id. at p. 11).

51.     On April 6, 1995, KV settled an FDA investigatory matter between KV and the Department of Justice through a misdemeanor plea agreement.  Under this agreement, KV agreed to accept responsibility for failing on two occasions in 1991 to make reports required by the FDA with respect to stability test data on an erythromycin product previously manufactured by KV for contract customers until 1992 and which had not been available on the market since then.  KV also agreed that two 1992 batches of the same product were inappropriately labeled as to shelf life.  (Id. at p. 8).

52.     As a result of these actions, the FDA placed KV on a special penalty list, refusing to approve new drug applications until the problems were rectified.  The FDA removed KV form the list in April 1998, at which point the agency began reviewing KV's applications for brand-name and generic drugs.  ("KV Pharmaceutical's New CEO Seeks to Rebuild Company's Reputation," St. Louis Beacon, December 21, 2009; 1999 Form 10-K).

53.     As a result of the FDA's enforcement actions, KV informed investors that it "implemented new programs to ensure full compliance with all of the FDA's regulatory requirements and their increasingly vigorous interpretation by the government."  1994 Form 10-K.

54.     Within several years later, the FDA discovered additional violations by KV.

55.     On May 9, 2000, the FDA issued a Warning Letter to KV identifying numerous cGMP violations discovered during a February/March 2000 inspection.  The Warning Letter emphasized the serious nature of these violations and stated that failure to correct these violations could lead to regulatory action, including seizure and/or injunction.  (Complaint filed in U.S. v. KV Pharmaceuticals, 4:09cv0034-RWS (E.D. Mo.) ("U.S. Complaint"), ¶ 25).

56.     On October 11, 2002, the FDA issued another Warning Letter to KV for marketing unapproved new drugs in violation of 21 U.S.C. § 355.

**Conduct During Class Period**

57.     In April 2003, the FDA issued a Warning Letter similar to that issued in May 2000 concerning KV's GMP violations and the possibility of government seizure in the event such violations continued.  (U.S. Complaint, ¶ 24).

58.     The FDA issued similar Warning Letters in January 2004, January 2005, March 2006, April 2007, March 2008, August 2008 and February 2009.  (Id.).

59.     Defendant Marc Hermelin and others at KV were personally made aware of such warnings and dire consequences for noncompliance no later than April 2003.  (Id.).

60.     According to KV's Corporate Governance Guidelines, "it is the Board's belief that management speaks for KV."

61.     Under KV's Code of Ethics:

As a public company, it is of critical importance that [KV's] filings with the [SEC] be accurate and timely. From time to time, employees may be called upon to provide information to ensure that the Company's public reports are complete, fair and understandable. The Company expects all of its personnel to take this responsibility seriously and to provide prompt and accurate answers to the Company's requests related to the Company's public disclosure requirements.[3]

62.     Throughout the Class Period, KV disseminated a number of false and misleading statements regarding KV's compliance with federal regulations governing  the manufacture and marketing of generic drug products and KV's current and future financial prospects.

63.     Many of the inaccurate statements set forth below were made in Forms 10-Ks and 10-Qs that were signed by Defendants Mark Hermelin (as Principal Executive Officer),

---

[3] Each Senior Executive of KV, including Defendant Marc Hermelin, was required to sign an acknowledgment form, stating that s/he has received a copy of the Code of Ethics, has read it, understands it, and agrees to comply with it.

Kanterman (as Principal Financial Officer), and Chibnall (as Principal Accounting

Officer), and were certified by Defendants Mark Hermelin and Kanterman in accordance with

the Sarbanes-Oxley Act of 2002, and were incorporated by reference into the Plan

documents.  By signing and certifying those Form 10-Qs and 10-Ks, Defendants Mark

Hermelin and Kanterman represented, *inter alia,* that the quality and accuracy of the information

contained in them regarding manufacturing processes and financial performance and condition

was safeguarded by KV's internal financial controls designed to ensure preparation of

reliable financial statements.

64.    The inaccurate statements made in Form 10-Ks that were also signed by the

Director Defendants in their capacities as Directors, in accordance with the Sarbanes-Oxley

Act of 2002 and, upon information and belief, were incorporated by reference into the Plan

documents.

65.    On October 31, 2006, KV announced that it had been served with a derivative

lawsuit filed in St. Louis City Circuit Court, alleging that certain stock option grants to current or

former Officers and Directors issued between 1995 and 2002 had been dated improperly.  In

response, the Board of Directors referred this matter to the independent members of its Audit

Committee, which subsequently established a Special Committee to investigate the matter.

(Form 8-K, filed October 31, 2006).

66.    On October 11, 2007, KV announced that the Special Committee had determined

that the Company's accounting for most of the stock option grants during FY 1996 through FY

2006 was not in accord with Generally Accepted Accounting Principles ("GAAP") because the

date of grant, as defined by KV, was improper.  Consequently, KV announced that it would

record an additional non-cash stock based compensation expense in the amount of $12 million,

net of tax, and restate its financials for the quarter ended June 30, 2006. KV announced that due to the options the restatement would be adding payroll taxes and penalties of $2.5 million, net of tax, for FY 2004, 2005 and 2006. (Form 8-K, filed October 12, 2007).

67.     The Board also stated that Defendant Marc Hermelin would repay the Company $1.4 million as a result of an internal investigation that found the Company's grant of stock options was improper. (Id.). KV also announced that in addition to expenses related to the stock options, an income tax expense of approximately $6.9 million would also be included in KV's restated consolidated financial statements for FYs 2004-2006. This was due to an increase in liability for uncertain tax positions taken in previous years, partially offset by certain tax refunds. (Id.).

68.     The Company also announced:

> Accordingly, the previously issued consolidated financial statements of the Company for the fiscal years ending March 31, 1996 through 2006 and the quarter ended June 30, 2006 should no longer be relied upon. **In addition, management's assessment of internal control over financial reporting, and the auditor's report on internal control over financial reporting for the year ended March 31, 2006 should also no longer be relied upon.** In addition, the Company's earnings and press releases and other communications should no longer be relied upon to the extent they relate to these financial statements. Management of the Company has discussed this conclusion with the Company's independent registered public accounting firm, KPMG LLP.

(Id. (emphasis added)).

69.     On February 15, 2008, KV issued a press release entitled "KV Pharmaceutical Company Completes Unaudited Fiscal 2007 Results; Receives Trading Extension from NYSE: Fiscal 2007 Marked Record Profitability and 12th Consecutive Year of Record Revenues — KV Also Reports Preliminary Fiscal 2008 Third Quarter Revenues of $164 Million, Up 39% from Prior Year," KV announced that it "anticipates its 13th consecutive year of record revenues in fiscal 2008."

70.    KV further represented that "[t]he financial condition of the Company remains strong. The Company held cash and marketable securities of $240.4 million at fiscal 2007 year-end."

71.    In that same press release, KV further represented that "New Product Approvals Supporting Growth, Contributing 53.1% of Consolidated Corporate Revenues with Gross Margins of 58.7%."  In commenting on the business performance of its subsidiary ETHEX Corporation, KV stated in part that:

> KV's specialty generic/non-branded subsidiary ETHEX Corporation, reported fiscal 2007 net revenues of $235.6 million, an increase of $31.8 million, or 15.6% compared to fiscal 2006 net revenues of $203.8 million.
>
> The Company believes [ETHEX's] gross margins in the generic drug industry segment remain significantly higher than average gross margins in the generic drug industry segment.
>
> In addition to the large portfolio of products in its own internal development pipeline, the Company also continues to see progress on its products under its co-development agreements. The Company believes that co-development agreements will continue to add incremental revenues to ETHEX's revenue base from its existing products, resulting from new planned introductions during the remained of fiscal 2008 and beyond.

72.    In addition, KV announced that the New York Stock Exchange ("NYSE") granted the Company's request for a trading extension through March 31, 2008, subject to ongoing reassessment.  KV reported that the extension was required under NYSE's rules due to the delay by the Company in filing its FY 2007 Annual Report as part of its Form 10-K submission to the SEC.  KV reported that it expected that it would be able to file by March 31, 2008, after completing its FY 2007 filings and restating the results for FYs 1996-2006.  (Id.).

73.    On February 15, 2008, KV common stock closed at a price of $26.69 per share.

74.     On February 27, 2008, KV reported its preliminary financial results for the third quarter and first nine months of fiscal 2008 ending on December 31, 2007.  In a press release entitled "*KV Pharmaceutical Reports Record Revenues for Fiscal 2008 Third Quarter and Year-to-Date on a Preliminary Basis: Third Quarter Revenues Up 38.8%, Nine-Month Revenues Up 40.6% - ETHEX Revenue Up 57.8% for Third Quarter, Up 65.2% for Nine Months – Ther-Rx Revenue Up 16.6% for Third Quarter, Up 15.2% for Nine Months,*" Defendant M. Hermelin declared that "KV enjoyed a solid third quarter...With continuing momentum in our branded business...we expect to capitalize on our performance momentum during the remained of fiscal 2008 and beyond."

75.     Touting "continued acceleration of revenue and profits at both the Company's branded drug subsidiary Ther-Rx Corporation, and generic/non-branded drug subsidiary ETHEX Corporation," KV reported that:

> Net revenue for third quarter increased 38.8% to $163.7 million, compared to $117.9 million for the third quarter of fiscal 2007. Ther-Rx net revenue grew 16.6% to $56.3 million, while ETHEX net revenues rose 57.8% to $102.2 million.
>
> Net revenue for the fiscal 2008 nine-month period improved 40.6% to $454.4 million compared to 323.1 million for the corresponding year-ago period.
>
> The nine-month results reflected continued strong performance by ETHEX Corporation, with net revenues up 65.2%, and the $21.1 million increase in net revenues reported by Ther-Rx Corporation.
>
> Gross profit for the recently completed nine-month period increased $106.7 million, or 50.2% over the corresponding prior year period, to $319.1 million.

76.     In the same press release, KV outlined the following *Financial Highlights:*

- 40.6% increase in year-to-date net revenues

- 50.2% increase in year-to-date gross profit

- 96.8% increase in year-to-date net income

- 89.2% increase in year-to-date diluted earnings per Class A Common Share.

77.     On February 27, 2008, KV common stock closed at $25.27 per share on trading volume more than twice as high as the previous day's volume.

78.     On March 26, 2008, KV finally filed its Form 10-K with the SEC for the period ending March 31, 2007 ("2007 10-K"). In the 2007 Form 10-K, KV announced that the SEC was conducting a formal investigation of its improper stock-option granting practices. (2007 Form 10-K, p. 2).

79.     In the 2007 Form 10-K, KV also announced that its retained earnings as of March 31, 2006: incorporated an additional expense of $16.3 million due to the failure to properly account for the stock options; an additional $5.4 million increase in income tax expense between 2004 and 2006 that should have been recorded in accordance with GAAP; and a $0.4 million reduction of net income related primarily to misstatements of net revenue and improperly recognized revenue which affected the costs of sales. (Id.).

80.     Additionally, in the 2007 Form 10-K, KV made a special announcement regarding its accounting practices: "WE HAVE MATERIAL WEAKNESSES IN INTERNAL CONTROL OVER FINANCIAL REPORTING AND CANNOT ASSURE YOU THAT ADDITIONAL MATERIAL WEAKNESSES WILL NOT BE IDENTIFIED IN THE FUTURE." (2007 Form 10-K, p. 23).

81.     The Company explained:

Section 404 of the Sarbanes-Oxley Act of 2002 requires us to evaluate the effectiveness of our internal control over financial reporting as of the end of each year, and to include a management report assessing the effectiveness of our internal control over financial reporting in each Annual Report on Form 10-K. Section 404 also requires our independent registered public accounting firm to

attest to, and report on, management's assessment of the Company's internal control over financial reporting.

In assessing the findings of the investigation as well as the restatement, management concluded there were material weaknesses, as defined in the Public Company Accounting Oversight Board's Auditing Standard No. 2, in our internal control over financial reporting as of March 31, 2007. Management is implementing steps to remediate these material weaknesses by March 31, 2008, however, we cannot assure you that such remediation will be effective.

* * *

Our internal control over financial reporting may not prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. Over time, controls may become inadequate because changes in conditions or deterioration in the degree of compliance with policies or procedures may occur. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

As a result, significant deficiencies or material weaknesses in our internal control over financial reporting may be identified in the future. Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could result in significant deficiencies or material weaknesses, cause us to fail to timely meet our periodic reporting obligations, or result in material misstatements in our financial statements. Any such failure could also adversely affect the results of periodic management evaluations and annual auditor attestation reports regarding disclosure controls and the effectiveness of our internal control over financial reporting required under Section 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated there under. If our internal control over financial reporting or disclosure controls and procedures are not effective, there may be errors in our financial statements that could require a restatement or our filings may not be timely and investors may lose confidence in our reported financial information, which could lead to a decline in our stock price.

(Id. at 22-23).

82.     KV Class A stock closed at $25.62 on March 26, 2008, and continued to trade

above $25 until the end of May 2008.

83.    On June 16, 2008, KV issued a press release entitled "KV Pharmaceutical Company Reports Fiscal 2008 Results: 13th Consecutive Year of Record Revenues – Year-Over-Year Net Revenues Up 35.7% to $601.9 Million – 114.2% Increase in Cash Flow From Operations – Ther-Rx Corporation New Revenues Up 13.9% to $214.9 Million, Crossing $200 Million for the First Time – ETHEX Corporation Net Revenues Up 56.1% to $367.9 Million, A Company Record," announcing its preliminary financial results for the fourth quarter and FY ended March 31, 2008.  Defendant M. Hermelin was quoted as stating that:

> KV had a strong fiscal 2008 with each of the Company's principal business units reporting record revenues and improves gross margins. We continued to exhibit a robust generic and branded pipeline during fiscal 2008.
>
> Overall, we believe KV is well positioned in both business for future growth and profitability. We remain positive about the Company's overall prospects from existing products as well as anticipated new product introductions.

84.    The same press release further reported that "Ther-Rx Corporation's net revenues increased $26.2 million, or $13.9%, to $214.9 million in fiscal 2008" and "ETHEX Corporation reported fiscal 2008 net revenues of $367.9 million, an increase of $132.3 million, or 56.1%, compared to fiscal 2007 net revenues of $235.6 million."

85.    With respect to its financial condition, KV claimed in the press release, "We believe the financial condition of the Company is solid: The Company held cash and marketable securities of $126.9 million at fiscal year-end."

86.    Moreover, KV stated that it "expects that the operating and product pipeline momentum experienced in fiscal 2008 will continue during fiscal 2009."  Defendant M. Hermelin went on to extol KV's immediate and long term prospects: "We believe fiscal 2009 will be another dynamic year of KV. Our revenue growth should be achieved through the continued benefits of all four strengths of our Metoprolol product line as well as the

expected launch of between eight to ten new products from ETHEX and Ther-Rx combined. **Overall, we believe KV is well positioned in both businesses for future growth and profitability. We remain positive about the Company's overall prospects from existing products as well as anticipated new product introductions."** (Id. (emphasis added)).

87.     The Company also disclosed a write-down of $5.5 million "related to inventories of certain cough/cold products previously marketed by ETHEX and subject to the hold initiated by the FDA in March 2008 for which the Company is not pursuing or planning to pursue regulatory approvals due to other higher priority pipeline opportunities. These products generated approximately $37.6 million in fiscal 2008 sales. In addition, the results include an accrual of $0.9 million for both the fourth quarter and full year related to the Company's estimated costs for a recall of certain lots of morphine sulfate 30 mg and 60 mg extended-release tablets." (Id.).

88.     On June 25, 2008, KV filed its delayed filing of its Form10-Qs for the quarters ended June 25, 2007, September 30, 2007 and December 31, 2007 and its10-K for the FY ended March 30, 2008.  For the quarter ended June 30, 2007, KV reported:

> Net revenues for the quarter increased $18.2 million, or 18.9%, as we experienced sales growth of 25.0% in our specialty generics segment and 18.3% in our branded products segment. The resulting $12.1 million increase in gross profit was offset in part by a $6.9 million increase in operating expenses before taking into account the $10.0 million of expense associated with the acquisition of Evamist(TM). The increase in operating expenses was primarily due to increases in personnel costs, branded marketing and promotions expense, legal and professional expenses, and research and development expense.

89.     In the June 25, 2008 filings, KV announced that FDA had initiated certain enforcement actions against the Company in March 2008:

> In March 2008, representatives of the Missouri Department of Health and Senior Services, accompanied by representatives of the FDA, notified us of a hold on our

inventory of certain unapproved drug products, restricting our ability to remove or dispose of those inventories without permission.

**The hold relates to a misinterpretation about the intended scope of recent FDA notices setting limits on the marketing of unapproved guaifenesin products.**

\* \* \*

**The FDA has not proposed, nor do we expect them to propose, that the products subject to the hold be recalled from the distribution channel. As such, we have written-off the value of the products subject to the hold in our inventory as of March 31, 2008. We also evaluated the active pharmaceutical ingredients and excipients used in the manufacture of the hold products and determined that they should also be written-off since we will be discontinuing further manufacturing and many of them cannot be returned or sold to other manufacturers. The write-off included in the results of operations for the fourth quarter of fiscal 2008 totaled $5.5 million.**

(10-Q for period ending December 31, 2007; emphasis added).

90.     Furthermore, KV revealed that in early June 2008 ETHEX had initiated a recall of

morphine sulfate:

> On June 6, 2008, ETHEX initiated a voluntary recall of a single lot of morphine sulfate 60mg extended-release tablets due to a report that a tablet with as much as double the appropriate thickness was identified and therefore the possibility that other oversized tablets could have been commercially released in the affected lot. On June 13, 2008, the recall was expanded to include additional specific lots of morphine sulfate 60 mg extended-release tablets and specific lots of morphine sulfate 30 mg extended release tablets. We accrued a liability of $0.9 million in the fourth quarter of fiscal 2008 for the anticipated cost of the recall. No oversized tablets have been identified in any additional distributed lot of these products and based on our investigation, there are likely to be few, if any, oversized tablets in the recalled lots. In addition, under ordinary pharmacy dispensing procedures, any significantly oversized tablets would likely be identified at the time of dispensing. However, the decision to recall the additional lots has been taken as a responsible precaution because of the possibility that there may be oversized tablets in the recalled lots.

(Id.).

91.     Upon KV's filing of the above Form 10-Qs, KV common stock closed at $19.21

per share on June 25, 2008 on high volume trading of over one million shares.

92.     On June 26, 2008, KV filed its Form 10-K for the period ending March 31, 2008 ("2008 Form 10-K").

93.     In the 2008 Form 10-K, KV announced that net revenues for fiscal 2008 increased $158.3, or 35.7%, as its experienced sales growth of 56.1% in its specialty generics/non-branded products segment.

94.     The 2008 Form 10-K assured that KV's financial statements included therein complied with GAAP in all material respects, stating in pertinent part:

> The consolidated financial statements that we file with the SEC are prepared in accordance with GAAP. The preparation of financial statements in accordance with GAAP involved making estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses, and the related disclosure of contingent assets and liabilities.

95.     Further, in the 2008 10-K, KV made the following representations regarding its compliance with FDA application requirements:

> All applications for FDA approval must contain information relating to product formulation, raw material suppliers, stability, manufacturing processes, packaging, labeling and quality control. Information to support the bioequivalence of generic drug products or the safety and effectiveness of new drug products for their intended use is also required to be submitted.
>
> *     *     *
>
> One requirement for FDA approval of NDAs and ANDAs is that our manufacturing procedures and operations conform to FDA requirements and guidelines, generally referred to as current Good Manufacturing Practices ("cGMP"). The requirements for FDA approval encompass all aspects of the production process, including validation and recordkeeping, and involve changing and evolving standards.
>
> *     *     *
>
> We manufacture drug products in liquid, cream, tablet, capsule and caplet forms for distribution by Ther-Rx, ETHEX and our corporate licensees and value-added specialty raw materials for distribution by PDI. **We believe that all of our facilities are in material compliance with applicable regulatory requirements.**

(2008 Form 10-K, p. 13 (emphasis added)).  KV had made similar statements asserting that the Company was in material compliance with cGMP in previous 10-K's.  (See 2004 Form 10-K, p. 29; see 2005 Form 10-K, p. 35; 2006 Form 10-K, p. 30; 2005 Form 10-K, p. 27).

96.    Contrary to KV's representations that the FDA was holding certain of its products due to a misinterpretation and that these products would not be recalled from the distribution channel, on July 29, 2008, federal agents seized $24.2 million worth of unapproved drugs from KV.  According to a July 29 <u>St. Louis Business Journal</u> news article entitled "*Agents seize $24M worth of unapproved drugs from KV Pharmaceutical,*" the seizure "followed an FDA inspection of several of the company's plants earlier this year, when investigators found the company was not complying with an FDA enforcement notice warning that drugs in time-release format containing guaifenesin, an expectorant, must be approved by the FDA to ensure the safe and effective release of the active ingredients."

97.    During the seizure, federal investigators also discovered that KV was manufacturing and distributing other unapproved new drugs, including drugs for coughs, colds, topical would healing, skin bleaching, and gastrointestinal conditions.

98.    U.S. Attorney Catherine Hanaway, who filed the civil forfeiture suit against KV and obtained the federal warrant for the seizure, declared that "American consumers are entitled to have safe and effective drugs. The majority of the products being seized *were* made after the FDA required an end to their production."

99.    That same day, KV issued a press release entitled "KV Set to Dispose of Previously Written Off Guaifenesin Inventory*"* that stated in relevant part:

> KV, in the financial statements contained in its fiscal 2008 filing in June, had written off the value of all affected products and recognized the financial impact of its decision not to resume the manufacture or sale of the products in question,

Therefore, there will be no further financial impact to KV related to the products to be destroyed.

100.    KV Class A Stock closed at $21.70 on July 29, 2008.

101.    On August 11, 2008, KV filed with the SEC its Form 10-Q for the first quarter of fiscal 2009 ended June 30, 2008. Continuing to portray its financial successes, KV announced that compared to the first quarter fiscal 2008, in the first quarter of fiscal 2009 net revenues increased more than 30%, gross profits increased 39%, and Company profits increased 102%.

102.    In the corresponding press release issued by KV entitled "KV Pharmaceutical Company Reports Fiscal 2009 First Quarter Results," Defendant M. Hermelin stated, "During the first quarter, KV delivered sharply improved profits and nearly $16 million in cash flow from operating activities. Performance was led by strong growth at ETHEX Corporation and continued competitiveness of our category-leading branded products at Ther-Rx. Both of these businesses are poised for further growth over the balance of fiscal 2009."

103.    In that press release, Defendant Marc Hermelin outlined what he portrayed as KV's positive results:

> During the first quarter, KV delivered sharply improved profits and nearly $16.0 million in cash flow from operating activities. Performance was led by strong growth at ETHEX Corporation and continued competitiveness of our category-leading branded products at Ther-Rx. Both of these businesses are poised for further growth over the balance of fiscal 2009 helped by recent introductions like metoprolol succinate extended-release tablets and our branded transdermal spray Evamistä. The Company's pipeline remains strong as well, with expectations of receiving one NDA approval and at least six ANDA approvals during the current fiscal year."

104.    In a departure from KV's previously stated policy, the Company's release included earning guidance:

**The Company currently expects to report net revenue of between $650 million and $675 million and net income per diluted Class A share of between $1.65 and $1.75 for the fiscal year ending March 31, 2009. Although KV historically has not issued revenue or earnings guidance, in light of potential competitive challenges related to certain of the Company's products, as well as new product launches planned during fiscal 2009 and their potential impact on fiscal 2009 financial performance, we are providing guidance for the current fiscal year.** It is not the Company's expectation to further update this guidance during the course of the fiscal year or for future periods.

Id. (emphasis added).

105.    However, under the heading "Subsequent Event," the Press Release described the

recently initiated Audit Committee Investigation into allegations of management misconduct:

**The Company was notified last week that the Audit Committee of its Board of Directors has recently commenced an independent inquiry into allegations made by sources not identified to management regarding alleged misconduct by management of the Company.** Since 1995, the Company has had in place a Standard of Business Ethics Policy. As part of this policy, an employee is encouraged to report, independent of management and for any reason, any action an employee suspects to be contrary to this code of ethics. Management has not been advised as to the specifics of the allegations and is not in a position to make an informed determination as to whether the allegations have any merit. **Management is not aware of and does not believe that there has been any misconduct that would have a material impact on the Company's financial results.** Management is cooperating fully with the Committee.

Id. (emphasis added).

106.    With respect to the Audit Committee Investigation, Sarah Weltscheff, a

KV spokeswoman, remarked: "What we said is what we know to date. Because we have a robust

business ethics policy, we don't believe there has been any misconduct." [cite to St. Louis Biz

Journal]

107.    On August 11, 2008, KV common stock closed at a trading price of $22.36 per

share.

108.    KV's statements and Defendants' certifications as set forth above were

inaccurate and/or failed to disclose, among other things, that:

(1)     the Company continued to manufacture and distribute unsafe generic drug products despite FDA warnings;

(2)     the Company would need to take additional write-offs related to unapproved products subject to FDA holds and FDA recalls;

(3)     the Company's manufacturing facilities failed to comply with federal regulations and guidelines;

(4)     the Company would need to take additional write-offs and incur additional expenses related to manufacturing interruptions and inefficiencies;

(5)     as a result of the foregoing, the Company's statements regarding its current financial health and fiscal 2009 guidance lacked a reasonable basis when made; and

(6)     by disseminating and/or certifying false and misleading statements contained in SEC filings, several Defendants engaged in multiple violations of the Company's Code of Ethics.

**The Truth Begins to Emerge**

109.    On October 23, 2008, the Company's Board approved indemnification agreements for each of the Company's Directors.  These agreements provide that KV shall indemnify the Directors against all costs, judgments, penalties, fines, liabilities, and amounts paid in settlement for any action taken by any Director in his or her official capacity.  (Form 8-K, filed October 23, 2008.)

110.    On or about November 10, 2008, KV issued a press release announcing that its Form 10-Q filing for the quarter ending September 30, 2008 would be delayed due to its Audit Committee's continuing investigation into allegations of management misconduct.  (Press Release, November 10, 2008.)  KV's statements and Defendants' certifications as outlined above were materially false and misleading when made and misrepresented and/or failed to disclose, among other things, that:

(1)     the Company continued to manufacture and distribute unsafe generic drug products despite FDA warnings;

(2)    the Company would need to take additional write-offs related to unapproved products subject to FDA holds and recalls;

(3)    the Company's manufacturing facilities failed to comply with federal regulations and guidelines;

(4)    the Company would need to take additional write-offs and incur additional expenses related to manufacturing interruptions and inefficiencies,

(5)    based on the foregoing, the Company's statements concerning its current financial health and fiscal 2009 guidance were lacking in a reasonable basis when made; and

(6)    By disseminating and/or certifying false and misleading statements contained in SEC filings, several Defendants engaged in multiple violations of KV's Code of Ethics.

111.    Following the news that KV's quarterly financial results would be delayed, KV common stock dropped from a closing price of $16.15 per share on November 7 to a closing price of $15.70 per share on November 10. On the following day, KV common stock fell to a closing price of $15.40 per share, and again dropped to a closing price of $14.24 per share on November 12.

112.    On November 13, 2008, KV filed a Form 12b-25 with the SEC further explaining why its quarterly report was delayed:

the Audit Committee of K-V Pharmaceutical Company (the "Company" or "KV"), with the assistance of legal counsel, including FDA regulatory counsel, and other advisers, is conducting an internal investigation with respect to a range of specific allegations, from multiple sources, involving, among other items, FDA regulatory and other compliance matters and management misconduct. One previously announced FDA recall of a Company product is associated with the investigation as are two new recalls involving several products dated November 7 and November 10, 2008. The Audit Committee presently intends to complete its investigation, deliver its findings and issue its recommended remedial actions before the end of December 2008. The timing of the review will delay the filing of the Company's Form 10-Q for the quarter ended September 30, 2008.

113.    In its From 12b-25, KV also disclosed adverse information concerning its financial results for the second quarter of FY 2009.  The Company reported an estimated loss of $0.06 per share for the second quarter of 2009, a decline of $0.76 per share from the prior year.

114.    The Company also announced that second quarter 2009 net revenues declined 16% ($28.6 million) compared to the same quarter last year.  Ethex revenues declined $20 million due in part to guaifenesin/hyrdocone product discontinuations ($7.0 million) and declined $18 million because of unshipped orders resulting from "manufacturing interruptions and inefficiencies."

115.    Further, KV said that it was withdrawing the revenue and earnings guidance for fiscal 2009 issued in August 2008, in which KV announced that it expected to report net revenue of between $650 million and $675 million and net income per diluted Class A share of between $1.65 and $1.75 for FY 2009. This was particularly shocking given that this guidance was had been a departure from KV's common practice of not providing earnings guidance.

116.    Upon this news, KV common stock plummeted from a closing price of $14.26 per share on November 12 to $5.90 per share on November 13.  This represented a drop of approximately 59% on trading volume of over 6.6 million shares, which volume was an increase of approximately 3,300% compared to November 23's trading volume, and more than 4,700% compared to the average trading volume for the prior seven days.

117.    KV Stock continued to slide over the next few weeks with Class A shares closing at $3.85 and Class B shares at $3.89 on December 4, 2008.

118.    On December 2, 2008, KV Defendants Marc Hermelin and Kanterman were named as defendants in a securities class action lawsuit filed in the United States District Court for the Eastern District of Missouri on behalf of investors who had purchased shares of KV.  See

Mas v. KV Pharmaceutical Co., 08-cv1859-CEJ.  Additional securities lawsuits have been filed

against KV, its officers, and its directors in the Eastern District of Missouri.  Herman Unvericht

v. KV Pharmaceutical Co., 09-cv-00061-RWS (filed January 9, 2009); Norfolk County

Retirement System v. KV Pharmaceutical Co., 09-cv-00138-CAS (filed Jan. 21, 2009)

(collectively "Securities Actions").

119.     The Securities Actions allege that the defendants misrepresented or failed to

disclose material facts relating to KV's activities.  Although this case and the Securities Actions

involve different legal claims, both share many common facts and both require investigation of

KV's practices as alleged above.

120.     On the morning of December 5, 2008, KV's CEO, Defendant Marc Hermelin,

announced his retirement.  (David Nicklaus, "KV Investors are Deserving of More Info on

CEO's Exit," St. Louis Post-Dispatch, December 12, 2008).

121.     Later that day, KV issued its own announcement, stating that the Board of

Directors, acting upon the recommendation of the Audit Committee, terminated the employment

agreement of  Defendant Marc Hermelin "for cause."  The Audit Committee's recommendation

resulted from its investigation of a range of specific allegations involving, among other things,

FDA regulatory and compliance matters and management misconduct. (Form 8-K, filed

December 5, 2008).

122.     Under Marc Hermelin's employment contract, "for cause" was described as the

"employee has committed a breach of a fiduciary duty, embezzlement, larceny, or has willfully

failed to perform his duties."  (David Nicklaus, "KV Investors are Deserving of More Info on

CEO's Exit," St. Louis Post-Dispatch, December 12, 2008).

123.    The Board of Directors also removed Defendant Marc Hermelin as Chairman of the Board of Directors and CEO, and appointed David A. Van Vliet to serve as interim CEO until a permanent replacement could be hired.

124.    In early December 2008, Marc Hermelin's wife and son (Defendant David Hermelin) left their positions with KV.  ("KV Pharmaceutical Recalls Products, Halts Production, Faces Uncertain Future," St. Louis Beacon, January 27, 2009).

125.    During an investors' conference call on December 8, 2008, new CEO David Van Vliet, responding to an analyst's question, stated that he was "unable to give […] a time frame on the audit committee investigation."  (Nicklaus, supra).

126.    On December 23, 2008, KV announced that it was suspending shipments of all FDA approved drugs in tablet form.  Tablet form products accounted for $159 million of KV's $602 million in revenue in FY 2008.  (Press Release, Dec. 23, 2008).

127.    KV explained that this action was "a precautionary measure to allow KV to expeditiously review and enhance comprehensively the company's manufacturing and quality systems, and to implement efficiency improvements in its production facilities."  (Id.).

128.    In the press release, KV also stated that it was "unable to determine when distribution of tablet-form products will resume, or estimate what the financial impact of the recall and suspension will be."  (Id.).

129.    In the same press release, KV announced recall of a shipment of its painkiller hydromorphone due to a report of an oversized tablet.  (Id.).

130.    Following these disclosures, KV Class A stock plunged to close at $2.71, down from $5.39 the previous day.  The Company Stock slid even further the following day, closing at $1.99.

131.    On January 22, 2009, in connection with FDA inspections, KV suspended manufacture and shipment of all products (excluding those it distributed but did not manufacture).  (Form 8-Ks, filed January 26, 2009 and February 25, 2009.)

132.    On January 26, 2009, KV announced its suspension of all manufacturing and shipping of its products. KV also disclosed that it was initiating a nationwide recall of most of its products.  The scope and depth of the recall is currently the subject of discussions with the FDA. (Id.).

133.    KV also disclosed that as of December 31, 2009, it may be out of compliance with one or more of the covenants in its revolving line of credit agreement, from which it had borrowed approximately $30 million.  KV stated that if lenders did not provide a waiver, KV's outstanding obligations under the credit agreement would immediately become due.  (Id.).

134.    Also, in the Form 8-K, KV announced formation of a Special Committee of the Board in response to a series of putative class action stockholder lawsuits that alleged violations of the federal securities laws by KV and certain individuals, and the receipt of an informal inquiry from the SEC.  (Id.).

135.    The Company also disclosed that it was responding to inquiries from the United States Attorney for the Eastern District of Missouri and the FDA.  (Id.).

136.    The Company further disclosed that it had fired its Senior Vice President and General Counsel Gregory Bentley.  (Id.).

137.    Finally, the Company announced that Gestiva, a drug that prevents pre-term births, would again be delayed because the FDA wanted more data and another clinical trial. (Id.).

138.    Following this announcement, KV's Class A Stock fell and closed at $0.51, down from the day's previous close of $2.24.

139.    On January 30, 2009, KV disposed of its existing inventory of products and certain raw materials.  (Form 8-K, February 25, 2009).

140.    On February 2, 2009, the FDA issued a Form 483 report setting forth its observations concerning product quality and deficiencies in the Company's compliance with cGMP regulations.  According to the Form 8-K filed with the SEC, "the FDA may take enforcement action against the Company, which could include administrative action, civil enforcement by means of judicial proceedings and criminal prosecution of the Company or individuals."  (Id.).

141.    On March 2, 2009, the United States of America filed a Compliant for Permanent Injunction against KV, Ethex, Ther-Rx, and four KV executives, among them Defendant Marc Hermelin.  In the U.S. Complaint, the government alleged that during the FDA's inspections of KV's facilities between December 15, 2008 and February 2, 2009 ("February 2009 inspection"), FDA investigators documented thirty-five (35) separate deviations from the FDA's cGMP, including:

    a.    Failure to follow the responsibilities and procedures applicable to the quality control unit, as required by 21 C.F.R. § 211.22(d);

    b.    Failure to establish control procedures to validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug product, as required by 21 C.F.R. § 211.110(a);

    c.    Failure to make written records of investigations into unexplained discrepancies and investigations of a batch or any of its components to meet specifications, as required by 21 C.F.R. § 211.192;

    d.    Failure to review and approve drug product production and control records by the quality control unit to determine compliance with all established,

approved written procedures before a batch is released or distributed, as required by 21 C.F.R. § 211.192;

e.   Failure to review and approve changes to written procedures by the quality control unit, as required by 21 C.F.R. § 211.100(a);

f.   Failure to clean, maintain, and sanitize equipment and utensils at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product, as required by 21 C.F.R. § 211.67(a); and

g.   Failure to follow written production and process control procedures in the execution of production and process control functions, as required by 21 C.F.R. § 211.100(b).

142.   The U.S. Complaint also alleged violations of the following sections of the Food and Drug Act:

a.   21 U.S.C. § 331(a), by introducing and delivering for introduction into interstate commerce articles of drug, as defined by 21 U.S.C. § 321(g)(1), that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

b.   21 U.S.C. § 331(k), by causing the adulteration, within the meaning of 21 U.S.C. § 351(a)(2)(B), of articles of drug, as defined by 21 U.S.C. § 321(g)(1), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

c.   21 U.S.C. § 331(d) by introducing or causing to be introduce into interstate commerce unapproved new drugs.

d.   21 U.S.C. § 331(a), by introducing and delivering for introduction into interstate commerce articles of drug, as defined by 21 U.S.C. § 321(g)(1), that are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

e.   21 U.S.C. § 331(k), by causing the misbranding within the meaning of 21 U.S.C. § 352(f)(1), of articles of drug, as defined by 21 U.S.C. § 321(g)(1), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

143.   The U.S. Complaint made it plain that the deficiencies observed by the FDA in the February 2009 inspection were the same as, or similar to, prior violations the FDA observed

in inspections in January 2004, January 2005, March 2006, April 2007, March 2008, August 2008, and February 2009. (U.S. Complaint, ¶¶ 23-24).

144.    On Monday, March 6, 2009, KV announced that it had entered into a consent decree with the FDA covering its suspended drug manufacturing and distribution. Under the consent decree, an independent consultant would review KV's facilities to certify compliance with FDA regulations. Further, KV agreed not to market products it manufactures until it has satisfied certain requirements designed to demonstrate compliance with FDA's cGMP regulations. Among those signing the Consent Decree for KV was Defendant Marc S. Hermelin. (Form 8-K, filed March 6, 2009).

145.    On June 2, 2009, KV announced that it estimates that costs for the multi-product recall, disposal of products, and potential claims by customers who had to procure products that KV could not supply will be $140-150 million for the fiscal year that ended March 31, 2009. (Form 8-K, filed on June 2, 2009.)

146.    Also, on June 2, 2009, KV announced that "[w]hile the Audit Committee's investigation has been substantially completed, the Audit Committee has referred certain matters with a potential financial reporting impact from its investigation to management for resolution." Id. Further, "[u]ntil these matters can be resolved, KV stated it will not be in a position to file its Annual Report for the fiscal year ended March 31, 2009 with the SEC." (Id.).

147.    On June 23, 2009, the Audit Committee found that as a result of its investigation, there were:

    a.    instances of noncompliance with FDA and other healthcare regulations and deficiencies in KV's regulatory compliance policies and procedures;

    b.    deficiencies in KV's financial analysis and budgeting controls and procedures;

      c.      deficiencies in KV's HR functions and employment policies and procedures; and

      d.      deficiencies in the conduct of certain members of Senior Management in, among other things, their interaction with the Board.

148.     As a result of these findings, KV announced that the Board had approved a framework to:

      a.      strengthen corporate governance and enhance Board oversight;

      b.      strengthen and enhance compliance with FDA and related regulatory requirements;

      c.      strengthen and enhance financial and accounting controls and procedures;

      d.      strengthen and enhance policies and practices in the employment area; and

      e.      strengthen and enhance compliance with federal and state legal and regulatory requirements governing pharmaceutical sales and marketing activities.

149.     Because KV did not detail the findings of the Audit Committee, additional information on which Plaintiff's claims are based are, very likely, solely within Defendants' possession and control.

## THE LAW UNDER ERISA

150.     **The Statutory Requirements**.  ERISA imposes duties upon plan fiduciaries. ERISA § 404(a) states in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and…for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims...and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

151.    **The Duty of Loyalty**.  ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and…for the exclusive purpose of…providing benefits to participants and their beneficiaries...."  The duty of loyalty includes a duty to avoid conflicts of interest and to resolve any conflicts promptly should they arise.  A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the fiduciaries themselves or of the plan sponsor.

152.    **The Duty of Prudence**.  ERISA imposes on a plan fiduciary the duty of prudence, that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...."

153.    **The Duty to Inform**.  The duties of loyalty and prudence include the duties to disclose and inform.  These duties entail: (a) a duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and, (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  The duties to disclose and inform recognize that a disparity may exist, and in this case did exist, between the training and knowledge of fiduciaries, on the one hand, and of participants, on the other.

154.    **The Duty to Investigate and Monitor Investment Alternatives**.  For plans such as this one, the duties of loyalty and prudence entail a duty to independently investigate and continually monitor the merits of the investments options offered by the plan, such as the merits of offering employer securities, to ensure that each investment is a suitable option for the plan.

40

155.  **The Duty to Monitor Appointed Fiduciaries**.  Fiduciaries who are responsible for appointing other fiduciaries have a concomitant duty to monitor those fiduciaries they appoint.  The duty to monitor entails providing information to, and reviewing the performance of, appointed fiduciaries.  For plans such as this one, monitoring fiduciaries must ensure that appointed fiduciaries:

    a.    possess the needed credentials and experience or use qualified advisors and service providers to fulfill their duties;

    b.    have knowledge of plan operations and goals, and the behavior and characteristics of Plan participants;

    c.    review the reasonableness of fees charged to the Plan in relation to the services performed;

    e.    are provided with adequate financial resources to discharge their duties;

    f.    have adequate information to perform their duty of overseeing plan investments in employer stock;

    g.    have access to outside, impartial advisors when needed;

    h.    maintain adequate records which document information on which they based decisions and analysis of plan investment options; and

    i.    report regularly to monitoring fiduciaries.

Monitoring fiduciaries must periodically review, comprehend and approve the conduct of the hands-on fiduciaries they have appointed.

156.  **The Duty to Follow Plan Documents with Prudence**.  A fiduciary may not avoid liability by rote reliance on plan language without considering its impact on his fiduciary duties.  While the plan sponsor may specify the basic structure of a plan, within limits, the fiduciary may not blindly follow plan documents if it would lead to an imprudent result.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

157.    In addition, and as alleged, Defendants failed to provide the investing public and the other fiduciaries and participants with complete and accurate information regarding the Company Stock in the Plan; the financial condition of the Company; the facts surrounding the selection of the funds offered to participants; and a comparison of the performance of the Company Stock to prudent investments that a truly independent fiduciary would and should have selected.

158.    The Department of Labor's § 404(c) regulations do not apply to the Plan.  The regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant."  Accordingly, § 404(c) does not apply here, and Defendants are liable for losses suffered by participants during the Class Period.

### COUNT I

### Breach of Duties of Loyalty and Prudence
### by Failing to Prudently and Loyally Manage the Plan and Plan Assets

### (Violation of ERISA § 404, 29 U.S.C. § 1104 by all Defendants)

159.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

160.    At all relevant times, Defendants acted as "fiduciaries" of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control with respect to the management of the Plan and the Plan's assets.

161.    Throughout the Class Period, the price of the KV stock was artificially inflated as a direct result of Defendants' scheme to misrepresent the state of the KV's manufacturing processes.  During the Class Period, KV concealed its violations of FDA regulations by failing to properly implement and utilize the Company's internal controls,

processes and procedures over its manufacturing functions and to attend to the proper training of its staff involved with the Company's manufacturing activities.

162.    Throughout the Class Period, the price of the KV stock was also artificially inflated as a direct result of Defendants' scheme to misrepresent the state of the KV's financial and accounting activities.  The financial statements issued during the Class Period and the statements that Defendants made about them were false and misleading.  Further, the financial reports and information were not prepared in conformity with GAAP or SEC guidelines, nor was the financial information a fair presentation of the Company's operations due to KV's improper accounting in violation of GAAP and SEC rules.

163.    During the Class Period, Defendants continued to invest in Company Stock despite the fact that  Defendants knew or should have known that Company Stock was not a prudent investment for the Plan or Plan participants and beneficiaries because KV its books and records did not report or disclose the Company's substantial manufacturing and financial problems.  Had Defendants revealed the truth about the Company's manufacturing processes and financial condition and results to the investment community, Plaintiff and the other Class members would not have purchased Company Stock or would have purchased shares at a substantially lower price.

164.    Defendants had a conflict of interest in continuing to invest in Company Stock for the Plan.  Due to the Hermelin family's controlling ownership of the Company, all of the employee fiduciaries held their positions at the will of various members of the CEO's family.  Based on information and belief, these fiduciaries failed to exercise independent judgment in the performance of their fiduciary duties and they labored under a conflict of interest that affected their duties as fiduciaries to invest plan assets solely in the interests of the Plan participants and

beneficiaries.  Defendants could have addressed this conflict of interest by appointing an independent fiduciary, selecting an independent financial advisor for the Plan, or requesting that the DOL be involved in selecting an appropriate method for managing the conflict.  Instead, they maintained, without change, the Plan's investment in Company Stock during a time when they knew or should have known that KV's financial condition was not as the Company was representing to the investing public but was, in fact, seriously deteriorating.

165.    The decisions by the Defendants respecting the Plan's investment in Company Stock, under the circumstances alleged herein, constitute an abuse of their discretion as ERISA fiduciaries.  Based on the information available to the investment fiduciaries, a prudent fiduciary could not have reasonably believed that further and continued investment of contributions and assets in Company Stock protected the interests of the participants and beneficiaries, and would have made different investment decisions.

166.    By their actions and omissions in authorizing or causing the Plan to invest in Company Stock, Defendants breached their duties of prudence and loyalty to the Plan under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

167.    As a direct and proximate result of these breaches, the Plan and, indirectly, its participants and beneficiaries, including Plaintiff, have lost millions of dollars.

168.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a), the Defendants are liable to restore all losses suffered by the Plan caused by breaches of their fiduciary duty in investing Plan assets.

<u>**COUNT II**</u>

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries**

**(Violation of ERISA § 404, 29 U.S.C. § 1104 by all Defendants)**

169.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

170.    At all relevant times, all Defendants acted as "fiduciaries" of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control in the management of the Plan and of Plan assets.

171.    The Defendants breached their duty to inform by failing to provide complete and accurate information regarding Company Stock, the extent of the Company's exposure to losses in connection with the Company's deteriorating financial condition, the Company's artificial inflation of the value of the stock, and, generally, by conveying incomplete and inaccurate information about the soundness of investing in Company Stock.

172.    The Defendants breached their duty to inform by failing to provide complete and accurate information regarding the financial problems and risks of investment in Company Stock until and unless it accurately reported and publicly disclosed its financial condition in its books. These actions and failures caused other Plan fiduciaries and certain participants and beneficiaries to maintain substantial investments in Company Stock at a time when these Defendants knew or should have known that Company Stock was not a prudent investment for the Plan or for its participants and beneficiaries.

173.    As a direct and proximate result of these breaches of fiduciary duties alleged, the Plan and its participants and beneficiaries, including Plaintiff, have lost millions of dollars.

174.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), all Defendants are liable to restore the losses to the Plan caused by breaches of their fiduciary duties.

## COUNT III

### Failure to Monitor the Plan's Fiduciaries

### (Violation of ERISA § 404, 29 U.S.C. § 1104 by KV and Director Defendants)

175.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

176.    At all relevant times, KV and the Defendant Directors Marc S. Hermelin, David S. Hermelin, Ronald J. Kanterman and Gerald R. Mitchell acted as "fiduciaries" within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), for the Plan because they were charged with, responsible for, and otherwise assumed the duty of, appointing, monitoring, and, when necessary, removing Plan fiduciaries.

177.    These Defendants breached their fiduciary duties by failing to adequately monitor the investment fiduciaries, Does 1-40, to whom they delegated management and investment responsibilities for the PLAN.  These Defendants knew that the Plan's other fiduciaries were abusing their discretion as ERISA fiduciaries because a prudent fiduciary could not have reasonably believed that further and continued investment in Company Stock, including continued purchases at inflated prices before the Company's financial problems were publicly disclosed, protected the interests of the Plan's participants and beneficiaries.  Despite this, the Defendants named in this Count failed to take action to protect the Plan and its participants from the failures of these other fiduciaries.

178.    The Defendants named in this Count, in discharging their monitoring and oversight duties, were required to disclose accurate information about the financial condition and practices of the Company to other fiduciaries directly involved in investment of Plan assets.  By remaining silent and failing to provide such information to the other fiduciaries, these Defendants breached their monitoring duties under ERISA.

179.    In summary, the Defendants named in this Count breached their monitoring duties by:

      a.    failing to adequately monitor the investing fiduciaries' investment of Plan assets;

      b.    failing to adequately monitor the Plan's other fiduciaries' implementation of Plan terms, including prudent investment of plan assets in KV Stock;

      c.    failing to disclose to the investing fiduciaries material facts about the financial condition and practices of the Company that Defendants named in this Count knew or should have known were material to prudent investment decisions about Plan's acquisition and retention of Company Stock and with respect to implementation of Plan terms; and

      d.    failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets.

180.    KV is also liable for breaches of duty by other Defendants and for the losses caused by them, under the law of agency, including principles of vicarious liability and *respondeat superior*; and KV is liable as indemnitor of these Defendants under corporate law, KV's articles of incorporation, individual indemnification agreements (where they exist), and other documents of corporate governance.

181.    As a direct and proximate result of these breaches of fiduciary duties alleged, the Plan and indirectly its participants and beneficiaries, including Plaintiffs, have suffered losses of millions of dollars.

182.    Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and

1109(a), the Defendants named in this Count are liable to restore the losses to the Plan caused by

the breaches of fiduciary duties by Defendants named in this Count.

## COUNT IV

### Breach of Co-Fiduciary Duties

### (Breach of Co-Fiduciary Duties in Violation of ERISA § 405, 29 U.S.C. § 1105, by all Defendants)

183.    Plaintiff incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

184.    A fiduciary is liable not only for fiduciary breaches within his or her sphere of

responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. §

1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this
> part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary
> responsibility of another fiduciary with respect to the same plan in the following
> circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act
> or omission of such other fiduciary, knowing such act or omission is a
> breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of
> his specific responsibilities which give rise to his status as a fiduciary, he
> has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

185.    By virtue of the facts and events alleged, and at all relevant times, all Defendants,

by failing to comply with their specific fiduciary responsibilities under ERISA § 404(a),

29 U.S.C. §1104(a), enabled their co-fiduciaries to commit violations of ERISA and, with

knowledge of such breaches, failed to make reasonable efforts to remedy the breaches.

Accordingly, Defendants are each liable for the others' violations pursuant to ERISA § 405(a)(2) and (3), 29 U.S.C. § 1105(a)(2) and (3).

186.    All Defendants are liable under Section 405 because their own fiduciary breaches in failing to appropriately monitor the fiduciaries they appointed, enabled these appointed fiduciaries to breach their duties under ERISA by, among other things, continuing to invest Plan assets in Company Stock when they knew that the Company was not accurately reporting in its books and records the true financial condition of the Company such that shares were being purchased at inflated prices and the participants were being informed that their accounts were worth more than their actual value.  This rendered investment in Company Stock in the Plan imprudent and not in the best interests of participants and beneficiaries.  Further, all Defendants knew that the other Defendants had breached their duties under Section 404 by continuing to invest in Company Stock at inflated prices when it was imprudent, disloyal, and contrary to ERISA to do so, yet they failed to make reasonable efforts to remedy the situation.

187.    By virtue of the facts and events alleged, at least Defendants KV and Defendant Marc Hermelin participated knowingly in, or knowingly undertook to conceal breaches of their co-fiduciaries, in violation of Section 405(a)(1) of ERISA.  As a result of their breaches of Section 405 of ERISA, Defendants have caused the Plan to suffer financial losses for which they are jointly and severally liable, pursuant to Section 409 of ERISA.

## CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this class action on behalf of a Class defined as:

All persons who were participants in or beneficiaries of the KV Pharmaceutical Company Fifth Restated Profit Sharing Plan whose accounts in the Plan were invested in Class A and/or Class B shares of KV stock at any time during the period of February 2, 2003 through the present.  Excluded are any Defendants, KV's officers and directors, members of their immediate families, or their heirs, successors or assigns.

189.    Class certification is appropriate under Rule 23(b)(1)(A) & (B) and 23(b)(2) or 23(b)(3) of the Federal Rules of Civil Procedure.

190.    The Class consists of more than 1,500 individuals and is so numerous that joinder of all members is impracticable.

191.    There are questions of law and fact common to the Class, which include:

a.    Whether all or some of Defendants are fiduciaries;

b.    Whether various Defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to offer Company Stock as an investment option given that Defendants knew or should have known that, because of KV's undisclosed manufacturing and financial problems, purchases of the Stock were being made at inflated prices;

c.    Whether various Defendants breached their fiduciary obligations to the Plan and participants by causing the Plan to make and maintain investments in Company Stock at a time as it was not prudent to do so;

d.    Whether various Defendants breached their fiduciary obligations to the Plan and participants by providing incomplete and inaccurate information to participants, and by preventing participants from exercising "independent control" over investments in Company Stock as a result;

e.    Whether the Company and the Director Defendants breached their fiduciary obligations to the Plan and participants by failing to prudently monitor the investment selection procedures and other activities of the Plan' other fiduciaries, including the administration of the Plan, such that the interests of the Plan and Plan participants were not adequately protected and served;

f.    Whether all of the Defendants, by failing to comply with their specific fiduciary duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), enabled and/or caused their co-fiduciaries to violate of ERISA and, despite knowledge of such breaches, failed to make reasonable efforts to remedy them, and are each liable for the others' violations pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a).

g.    Whether as a result of fiduciary breaches by the defendants, the Plan, participants and beneficiaries have suffered losses.

192.     Plaintiffs' claims are typical of the Class and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have no interest that is antagonistic to or in conflict with the interest of the Class as a whole, and they have engaged competent counsel experienced in class actions and ERISA actions of this nature.

193.     This action is properly maintainable as a class action for the following independent reasons and under these portions of Rule 23:

a.     Given ERISA's imposition of a uniform standard of conduct on ERISA fiduciaries, prosecution of separate actions by individual members of the Class would create the risk of inconsistent adjudications which would establish incompatible standards of conduct for Defendants with respect to their obligations under the Plan.  Fed.R.Civ.P. 23(b)(1)(A).

b.     The prosecution of separate actions by members of the Class would create a risk of adjudications for individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Fed.R.Civ.P. 23(b)(1)(B).

c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole. Fed.R.Civ.P. 23(b)(2).

d.     Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Fed.R.Civ.P. 23(b)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     Certify this action as a class action pursuant to Fed.R.Civ.P. 23;

2.     Appoint Stember Feinstein Doyle & Payne. LLC and Harwood Feffer LLP as class counsel and Weinhaus & Potashnick and Wolf and D'Agrosa as liaison counsel.

3.     Declare that Defendants, and each of them, have breached their fiduciary duties to the Plan' participants and beneficiaries;

4.      Issue an order compelling Defendants to restore to the Plan all losses suffered by the Plan as a result of these breaches, including restoring the return on investments that the Plan, Plaintiff, participants and beneficiaries would have realized had Defendants discharged their duty of prudent and loyal investment of the Plan' assets;

5.      Order equitable restitution and other appropriate equitable monetary relief against Defendants;

6.      Award such other equitable or remedial relief as may be appropriate, including permanent removal of Defendants from any positions of trust with respect to the Plan and appointment of independent fiduciaries to administer the Plan;

7.      Enjoin Defendants, and each of them, from any further violations of ERISA fiduciary responsibilities, obligations and duties;

8.      Order Defendants or successor fiduciaries to allocate Plan recoveries to the accounts of all participants who had any portion of their account balances invested in the KV stock in proportion to the accounts' losses attributable to the decline in KV's stock price;

9.      Award attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

10.     Award such other and further relief as the Court deems equitable and just.

Respectfully Submitted,

Dated:  June 26, 2009                          /s/ Stephen M. Pincus
                                               Stephen M. Pincus
                                               John Stember
                                               Ellen M. Doyle
                                               **Stember Feinstein Doyle & Payne, LLC**
                                               Allegheny Building, 17th Flr.
                                               429 Forbes Avenue
                                               Pittsburgh, PA  15219
                                               Tel: (412) 281-8400
                                               Fax:(412) 281-1007

                                               *Interim Co-Lead Counsel*

Robert I. Harwood
Peter W. Overs, Jr.
**Harwood Feffer LLP**
488 Madison Avenue, 8th Floor
New York, NY 10022
Tel: (212) 935-7400
Fax: (212) 753-3630

*Interim Co-Lead Counsel*

Paul J. D'Agrosa
**Wolf and D'Agrosa**
7710 Carondelet Avenue, Suite 200
Clayton, MO 63105
Tel: (314) 725-8019
Fax: (314) 725-8443

*Interim Co-Liaison Counsel*

S. Sheldon Weinhaus, E.D. Mo. #4670
Mark Potashnick, E.D. Mo. #35970
**Weinhaus & Potashnick**
11500 Olive Blvd., Suite 133
St. Louis, MO 61341
Tel.: (314) 997-9150
Fax: (313) 997-9170

*Interim Co-Liaison Counsel*

Major Khan
**Major Khan LLC**
20 Bellevue Terrace
Weehawken, NJ 07086
Tel: (646) 546-5664
Fax: (646) 546-5755

*Counsel for Plaintiff Bodnar*

Thomas J. McKenna
**Gainey & McKenna**
295 Madison Avenue
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing document was served electronically via the

CM/ECF system on all counsel of record on this 26th day of June, 2009.


/s/Stephen M. Pincus
Stephen M. Pincus