UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HAROLD S. CROCKER, JR., and ANNA BODNAR, Individually and on Behalf of Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 4:09-CV-198 (CEJ) |
| vs. | ) ) | |
| | ) | |
| KV PHARMACEUTICAL COMPANY, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the defendants' motions to dismiss the consolidated amended complaint of plaintiffs Harold S. Crocker, Jr., and Anna Bodnar, pursuant to Rule 12(b)(6), Fed.R.Civ.P. Plaintiffs filed an opposition, and the issues are fully briefed.

### I. The Parties[1]

Plaintiffs are employees of defendant KV Pharmaceutical Company (KV) and participants in KV's Fifth Restated Profit Sharing Plan and Trust (the Plan). (Doc. #72, at 4, para. 7-8). Plaintiffs purport to represent "all participants in or beneficiaries of the Plan . . . whose individual Plan accounts were invested in KV Class A common stock and/or KV Class B common stock . . . at any time between February 2, 2003 through the present (the "Class Period")."[2] Id. at 1-2 (footnote omitted).

---

[1]The description of the parties as well as the factual and procedural allegations are based on the allegations in plaintiffs' amended complaint. Plaintiffs name Thomas Tomaro as a defendant in their amended complaint. On August 21, 2009, the Court dismissed Mr. Tomaro from this action in accordance with plaintiffs' notice of dismissal.

[2]Plaintiffs purport to bring this action on behalf of a class. However, the Court has not yet certified the putative class.

KV is a pharmaceutical company that develops, manufactures, and markets prescription drug products.  KV's securities include Class A and B common stock as well as preferred stock.

Marc S. Hermelin (M. Hermelin) served as Chairman of the Board of KV (the "Board") as well as the Chief Executive Officer throughout the Class Period.

David S. Hermelin (D. Hermelin) served as a director and Vice President of KV until he resigned in December 2008, but he continues to serve on the Board.

Ronald J. Kanterman has served on the Board since March 26, 2008, and served as a KV principal executive officer[3] in his official capacity as Vice President, Chief Financial Officer, Treasurer, and Assistant Secretary throughout the Class Period.  "Kanterman is [also] a member of a committee of KV executives and employees that administers the Plan[.]"  (Doc. #72, at 5, para. 11).

Likewise, Gerald R. Mitchell served as KV's Principal Financial Officer in his official capacity as KV's Chief Financial Officer and a member of the Board.  Mitchell "is a member of a committee of KV executives and employees that administers the Plan[.]"[4]  Id. at 6, para. 13.

Richard H. Chibnall has served as KV's Principal Accounting Officer[5] in the capacity as KV's Vice President and Chief Accounting Office since June 2005, and as Vice President of Finance from February 2000 through June 2005.  Id. , para. 15.  Chibnall "is a member of a committee of KV executives and employees that administers the Plan[.]"  Id.

---

[3] See (Doc. #102, at 15).

[4] The Court will refer to defendants M. Hermelin, D. Hermelin, Kanterman and Mitchell collectively as the "Director Defendants." See (Doc. #72, at 6, para. 14).

[5] See (Doc. #102, at 15).

Melissa Hughes has served as KV's Director of Human Resources since January 2006, and "is a member of a committee of KV executives and employees that administers the Plan[.]" (Doc. #72, at 6 para. 16).

Mary Ann Tichner is KV's Benefits Manager and is "a member of a committee of KV executives and employees that administers the Plan[.]" Id., at 7, para. 17).[6]

Finally, in their amended complaint, plaintiffs name Does 1-20 as defendants. Does 1-20 are identified as "additional fiduciaries of the Plan [who] include the individuals who administer the Plan." Id., at 7, para. 20.

## II.   The Plan

The Plan is an employee pension benefit plan within the meaning of §§ 3(3) and 3(2)(A) of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(2)(3) and 1002(2)(A).   The Plan is also a defined contribution, an eligible individual account plan (EIAP), within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that separate individual accounts are maintained for each participant based upon his/her contribution to such account. Id., at 8, para. 22.

The Plan is maintained under the documents as amended and restated as of January 1, 2002 (the 2002 Plan Document). Id. at 8, para. 24.   KV is the named Plan administrator and sponsor.   "As Plan Sponsor [and] Administrator[, KV] select[s] investment options or alternatives in the Plan and [has] the right to change or remove any investment option." Id. at 10, para. 32.   "In addition, [KV has] authority and discretion to appoint, monitor, and remove [KV] directors, officers, and employees as fiduciaries of the Plan." (Doc. #72, at 10, at para. 33).   Pursuant to a Fidelity Advisor

---

[6]The Court will refer to defendants Kanterman, Mitchell, Chibnall, Hughes, and Tichner collectively as the "Committee Defendants." See (Doc. #72, at 7, para. 19).

401(k) Premium Service Plan Service Agreement (the Service Agreement),[7] Fidelity

Management Trust Company also administers the Plan. Id. at 8, para. 25.

> According to the 2002 Plan Document:

> Full-time employees are eligible to participate in both the Deferral
> Contribution and Matching Employer Contribution benefits of the Plan
> upon completion of one year, or 1,000 hours of service, for the Company
> and upon reaching 21 years of age.   Each employee may become a
> participant of the Plan on the first pay period coinciding with, or
> following, the fulfillment of the eligibility requirements.  Plan participants
> may contribute up to 14% of their covered compensation, up to the
> maximum allowable under [the] Internal Revenue Code.    These
> contributions are allocated as directed by the participant. The Company
> matches 50% of a participant's contribution not to exceed 7% of a
> participant's covered compensation. Participants become fully vested in
> such matching contributions gradually over a 6-year period.   These
> contributions are allocated as directed by the participant.  In addition, the
> Company may also make a profit sharing contribution on a discretionary
> basis on behalf of all eligible Plan participants, whether or not participants
> make an elective contribution for the Plan year.    Profit sharing
> contributions are based on the Company's profitability and are allocated
> to participant accounts based on compensation levels.   These
> contributions are 100% participant directed.  Participants become 100%
> vested after five years, with no vesting prior to such time. There are
> approximately 27 investment options under the Plan, one of which is the
> KV A Stock Fund.

Id., at 8-9, para. 27-31 (internal citations omitted).

"ERISA requires that every participant in an employee benefit plan be given a

Summary Plan Description ("SPD"), the latest version of which for the Plan [is] dated

February 4, 2009." Id. at 8, para 24.  KV was responsible for distributing the SPD

prospectus to the Plan participants. Id. at 11, para. 36. The Prospectus "describe[s]

the investment characteristics of the Plan's various investment options[, and]

contained or incorporated . . . representations disseminated to participants[.]" (Doc.

#72, at 11, para. 36).

---

[7]The current Service Agreement was executed on September 15, 2008.  (Doc.
#72, at 8, para. 25).

"The KV Plan Committee Defendants . . . had discretionary authority and control regarding the administration and management of the Plan and/or Plan assets, . . . possessed the full authority in their absolute discretion to determine all questions of eligibility for entitlement of Plan benefits [, and was] responsible for selecting, evaluating, monitoring, and altering investment alternatives offered by the Plan." Id. at 12, para. 42.

### III.   Factual and Procedural Background

In April 2003, the United States Food and Drug Administration issued KV a warning letter. Id. at 16, para. 57. The FDA also issued KV warning letters in January 2004, January 2005 and March 2006. Id. at para. 58.

On October 31, 2006, KV filed a Form 8-K, announcing that:

[I]t had been served with a derivative lawsuit filed in St. Louis City Circuit Court, alleging that certain stock option grants to current or former Officers and Directors issued between 1995 and 2002 had been dated improperly. In response, the Board of Directors referred this matter to the independent members of its Audit Committee, which subsequently established a Special Committee to investigate the matter. . . .

The Board also stated that Defendants Marc Hermelin would repay the Company \$1.4 million as a result of an internal investigation that found that the Company's grant of stock was improper. KV [stated] that in addition to expenses related to the stock options, an income tax expense of approximately \$6.9 million would also be included in KV's restated consolidated financial statements for [fiscal years] 2004-2006. . . . due to an increase in liability for uncertain tax positions in previous years, partially offset by certain tax refunds.

Accordingly, the previously issued consolidated financial statements of the Company for the fiscal years ending March 31, 1996 through 2006 and the quarter end[ing] June 30, 2006 should no longer be relied upon. **In addition, management's assessment of internal control over financial reporting, and the auditor's report on internal control over financial reporting for the year end[ing] March 31, 2006 should also no longer be relied upon.** In addition, the Company's earnings and press releases and other communications should no longer be relied upon to the extent they relate to these financial statements. Management of the Company has discussed this conclusion with the Company's independent registered public accounting firm, KPMG LLP.

(Doc. #72, at 17-18, para. 65, 67-68) (emphasis in original).

In April 2007, the FDA issued KV a warning letter.  Id. at para. 58.  Then, on October 11, 2007, KV filed a Form 8-K, announcing that "the Special Committee had determined that the Company's accounting for most of the stock option grants during [fiscal year] 1996 through [fiscal year] 2006 was not in accord with Generally Accepted Accounting Principles ("GAAP") because the date of the grant, as defined by KV, was improper."  Id. at 17, para. 66.  "Consequently, KV announced that it would record an additional non-cash stock based compensation expense in the amount of \$12 million, net of tax, and restate its financials for the quarter end[ing] June 30, 2006."  Id. at 17-18, para. 66.  KV also explained "that[,] due to the options[,] the restatement would be adding payroll taxes and penalties of \$2.5 million, net of tax, for [fiscal years] 2004, 2005, and 2006."  Id., at 18, para. 66.

In a press release dated February 15, 2008, KV announced that it "anticipate[d] its 13th consecutive year of record revenues in fiscal [year] 2008."  Id. at 18, para. 69.  "KV further represented that '[t]he financial condition of the Company remain[ed] strong[, and that KV] held cash and marketable securities of \$240.4 million at fiscal 2007 year-end.'"  Id., at 19, para. 70.  Additionally, KV stated that its new product approval contributed 53.1% of the company's consolidated corporate revenue gross margins equal to 58.7%, and that:

> KV's speciality generic/non-branded subsidiary ETHEX Corporation, reported fiscal 2007 net revenues of \$235.6 million, an increase of \$31.8 million, or 15.6% compared to fiscal [year] 2006 net revenues of \$203.8 million.
>
> The Company believes [ETHEX's] gross margins in the generic drug industry segment remain significantly higher than average gross margins in the generic industry segment.
>
> In addition to the large portfolio of products in its own internal development pipeline, the Company also continues to see progress on its

- 6 -

products under its co-development agreements. The Company believes that co-development agreements will continue to add incremental revenues to ETHEX's revenue base from its existing products, resulting from new planned introductions during the remain[der] of fiscal [year] 2008 and beyond.

(Doc. #72, at 19, para. 71) (second alteration in original). KV explained "that the New York Stock Exchange ("NYSE") granted the Company's request for a trading extension through March 31, 2008 [, which] was required under NYSE's rules, do to the delay by the Company in filing its [fiscal year] 2007 Annual Report as part of its Form 10-K submission to the [Securities and Exchange Commission ("SEC")]." Id. at para. 72. Finally, "KV reported that it expected that it would be able to file by March 31, 2008, after completing its [fiscal year] 2007 filings and restating the results for [fiscal years] 1996-2006." Id.

On February 15, 2008, KV common stock closed at \$26.69 per share. Id. at para. 73. Then, in a press release issued February 27, 2008, "KV reported its preliminary financial results for the third quarter and first nine months of fiscal [year] 2008 ending on December 31, 2007." Id., at 20, para. 74. KV explained that:

Net revenues for [the] third quarter increased 38.8% to \$163.7 million, compared to \$117.9 million for the third quarter of fiscal [year] 2007. Ther-Rx net revenue[s] grew 16.6% to \$56.3 million, while ETHEX net revenues rose 57.8% to \$102.2 million.

Net revenue for the fiscal [year] 2008 nine-month period improved 40.6% to \$454.4 million compared to [\$]323.1 million for the corresponding year-ago period.

The nine-month results reflected continued strong performance by ETHEX Corporation, with net revenues up 65.2%, and the \$21.1 million increase in net revenues reported by Ther-Rx Corporation.

Gross profit for the recently completed nine-month period increased \$106.7 million, or 50.2% over the corresponding prior year period, to \$319.1 million.

(Doc. #72, at 20, para. 75). KV also reported a 40.6% increase in year-to-date net revenues, 50.2% increase in year-to-date gross profit, 96.8% increase in year-to-date net income, and 89.2% increase in year-to-date diluted earnings per Class A common stock. Id. at 20-21, para. 76. Additionally, "M. Hermelin declared that 'KV enjoyed a solid third quarter. . . . With continuing momentum in our branded business[,] we expect to capitalize on our performance during the remain[der] of fiscal [year] 2008 and beyond.'" Id. at 20, para. 74. That same day, "KV common stock closed at $25.27 per share on [a] trading volume more than twice as high as the previous day's volume." Id. at 21, para. 77.

In March 2008, the FDA issued KV a warning letter. Id. at 16, para. 58. Then, on March 26, 2008, KV filed a Form 10-K, announcing that:

[T]he SEC was conducting a formal investigation of its improper stock-option granting practices. . . .

[I]ts retained earnings as of March 31, 2006: incorporated an additional expense of $16.3 million due to the failure to properly account for the stock options; an additional $5.4 million increase in income tax expense between 2004 and 2006 that should have been recorded in accordance with GAAP; and a $0.4 million reduction of net income related primarily to misstatements of net revenue and improperly recognized revenue which affected the costs of sales. . . .

We have material weaknesses in internal control over finance reporting and cannot assure you that additional material weaknesses will not be identified in the future.

Section 404 of the Sarbanes-Oxley Act of 2002 requires us to evaluate the effectiveness of our internal control over financial reporting as of the end of each year, and to include a management report assessing the effectiveness of our internal control over financial reporting in each Annual Report on Form 10-K. Section 404 also requires our independent registered public accounting firm to attest to, and report on, management's assessment of the Company's internal control over financial reporting.

In assessing the findings of the investigation as well as the restatement, management concluded there were material weaknesses, as defined in the Public Company Accounting Oversight Board's Auditing Standard No.

2, in our internal control over financial reporting as of March 31, 2007. Management is implementing steps to remediate these material weaknesses by March 31, 2008, however, we cannot assure that such remediation will be effective.

\* \* \*

Our internal control over financial reporting may not prevent all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. Over time, controls may become inadequate because changes in conditions or deterioration in the degree of compliance with policies or procedures may occur. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

As a result, significant deficiencies or material weaknesses in our internal control over financial reporting may be identified in the future. Any failure to maintain or implement required new or improved controls, or any difficulties we encounter in their implementation, could result in significant deficiencies or material weaknesses, cause us to fail to timely meet our periodic reporting obligations, or result in material misstatements in our financial statements. Any such failure could also adversely affect the results of periodic management evaluations and annual auditor attestation reports regarding disclosure controls and the effectiveness of our internal control over financial reporting or disclosure controls and procedures are not effective, there may be errors in our financial statements that could require a restatement or our filings may not be timely and investors may lose confidence in our reported financial information, which could lead to a decline in our stock price.

(Doc. #72, at 21-22, para. 78-81) (internal citations omitted). After KV issued this

press release, KV's Class A common stock closed at $25.62. Id. at 22, para. 82.

In a press release dated June 16, 2008 , KV announced:

Ther-Rx Corporation's net revenues increased $26.2 million, or $13.9%, to $214.9 million in fiscal [year] 2008" [and] "ETHEX Corporation reported fiscal [year] 2008 net revenues of $367.9 million, an increase of $132.3 million, or 56.1% compared to fiscal [year] 2007 net revenues of $235.6 million. . . .

We believe the financial condition of the Company is solid: The Company held cash and marketable securities of $126.9 million at fiscal year-end. . . .

[We] expect[] that the operating and product pipeline momentum experienced in fiscal [year] 2008 will continue during fiscal [year] 2009. . . .

[We will write-down $5.5 million] related to inventories of certain cough/cold products previously marketed by ETHEX and subject to the hold initiated by the FDA in March 2008 for which the Company is not pursuing or planning to pursue regulatory approvals due to other higher priority pipeline opportunities.  These products generated approximately $37.6 million in fiscal [year] 2008 sales.  In addition, the results include an accrual of $0.9 million for both the fourth quarter and full year related to the Company's estimated costs for a recall of certain lots of morphine sulfate 30 mg and 60 mg extended-release tablets.

(Doc. #72, at 23-24, para. 84-87).   Additionally, the press release included the

following quote from M. Hermelin:

KV had a strong fiscal [year] 2008 with each of the Company's principal business units reporting record revenues and improve[d] gross margins.  We continued to exhibit a robust generic and branded pipeline during fiscal [year] 2008. . . .

We believe fiscal [year] 2009 will be another dynamic year [for] KV.  Our revenue growth should be achieved through the continued benefits of all four strengths of our Metoprolol product line as well as the expected launch of . . . eight to ten new products from ETHEX and Ther-Rx combined.  **Overall, we believe KV is well positioned in both businesses for future growth and profitability.   We remain positive about the Company's overall prospects from existing products as well as anticipated new product introductions.**

Id. at 23-24, para. 83, 86 (internal citations omitted) (emphasis in original).

On June 25, 2008, KV submitted delayed Form 10-Qs for the fiscal quarters

ending June 25, 2007, September 30, 2007, and December 31, 2007, and filed a Form

10-K for the fiscal year ending March 30, 2008.  (Doc. #72, at 24, para. 88).  In the

SEC filings, KV announced:

Net revenues for the quarter [ending on June 30, 2007] increased $18.2 million, or 18.9%, as we experienced sales growth of 25.0% in our specialty generics segment and 18.3% in our branded products segment.

- 10 -

The resulting $12.1 million increase in gross profit was offset in part by a $6.9 million increase in operating expenses before taking into account the $10.0 million of expense associated with the acquisition of Evamist (TM).  The increase in operating expenses was primarily due to increases in personnel costs, branded marketing and promotions expense, legal and professional expenses, and research and development expense[s]. . . .

In March 2008, representatives of the Missouri Department of Health and Senior Services, accompanied by representatives of the FDA, notified us of a hold on our inventory of certain unapproved drug products, restricting our ability to remove or dispose of those inventories without permission.

**The hold relates to a misinterpretation about the intended scope of recent FDA notices setting limits on the marketing of unapproved guaifenesin products.**

* * *

**The FDA has not proposed, nor do we expect them to propose, that the products subject to the hold be recalled from the distribution channel.  As such, we have written-off the value of the products subject to the hold in our inventory as of March 31, 2008.  We also evaluated the active pharmaceutical ingredients and excipients used in the manufacture of the hold products and determined that they should also be written-off since we will be discontinuing further manufacturing and many of them cannot be returned or sold to other manufacturers.  The write-off included in the results of operations for the fourth quarter of fiscal [year] 2008 totaled $5.5 million**. . . .

On June 6, 2008, ETHEX initiated a voluntary recall of a single lot of morphine sulfate 60mg extended-release tablets due to a report that a tablet with as much as double the appropriate thickness was identified and therefore the possibility that other oversized tablets could have been commercially released in the affected lot.  On June 13, 2008, the recall was expanded to include additional specific lots of morphine sulfate 60 mg extended-release tablets and specific lots of morphine sulfate 30 mg extended[-]release tablets.  We accrued a liability of $0.9 million in the fourth quarter of fiscal [year] 2008 for the anticipated costs of the recall. No oversized tablets have been identified in any additional distributed lot of these products and based on our investigation, there are likely to be few, if any, oversized tablets in the recalled lots.  In addition, under ordinary pharmacy dispensing procedures, any significantly oversized tablets would likely be identified at the time of dispensing.  However, the decision to recall the additional lots has been taken as a reasonable precaution because of the possibility that there may be oversized tablets in the recalled lots.

- 11 -

(Doc. #72, at 24-25, para. 88-91) (internal citations omitted) (emphasis in original).

The same day that KV issued the press release, "KV common stock closed at $19.21

per share . . . on high volume trading over one million shares." Id. at 25, para. 91.

On June 26, 2008, KV filed a Form 10-K for the fiscal year ending March 31,

2008. Id. at 26, para. 92. "In the 2008 Form 10-K, KV announced that [its] net

revenues for fiscal [year] 2008 increased $158.3, or 35.7%, as its experienced sales

growth of 56.1% in its speciality generics/non-branded products segment. Id. at para.

93. Additionally, KV announced that:

> The consolidated financial statements that we file with the SEC are
> prepared in accordance with GAAP. The preparation of financial
> statements in accordance with GAAP involved making estimates and
> judgments that affect the reported amounts of assets, liabilities,
> revenues and expenses, and the related disclosure of contingent assets
> and liabilities. . . .
>
> All applications for FDA approval must contain information relating to
> product formulation, raw material suppliers, stability, manufacturing
> processes, packaging, labeling and quality control.   Information to
> support the bioequivalence of generic drug products or the safety and
> effectiveness of new drug products for their intended use is also required
> to be submitted.
>
> \* \* \*
>
> One requirement for FDA approval of [new drug applications,] NDAs[,]
> and [abbreviated new drug applications,] ANDAs[,] is that our
> manufacturing procedures and operations conform to FDA requirements
> and guidelines, generally referred to as current Good Manufacturing
> Practices ("cGMP").  The requirements for FDA approval encompass all
> aspects of the production process, including validation and
> recordkeeping, and involve changing and evolving standards.
>
> \* \* \*
>
> We manufacture drug products in liquid, cream, tablet, capsule and
> caplet forms for distribution by Ther-Rx, ETHEX and our corporate
> licensees and value-added specialty raw materials for distribution by PDI.
> **We believe that all of our facilities are in material compliance
> with applicable regulatory requirements.**

(Doc. #72, at 26, para. 94-95) (internal citations omitted) (emphasis in original).

"[O]n July 29, 2008, federal agents seized $24.2 million worth of unapproved drugs from KV." Id. at 27, para. 96. "During the seizure, federal investigators . . . discovered that KV was manufacturing and distributing other unapproved new drugs, including drugs for coughs, colds, topical [womb] healing, skin bleaching, and gastrointestinal conditions." Id. at para. 97. The then-United States attorney, Catherine Hanaway, "declared that 'American consumers [were] entitled to have safe and effective drugs. The majority of the products [that were] seized *were* made after the FDA required an end to their production.'" Id. at para. 98 (emphasis in original).

That same day, KV issued a press release, announcing:

[I]n the financial statements contained in its fiscal [year] 2008 filing in June, [it] had written off the value of all affected products and recognized the financial impact of its decision not to resume the manufacture or sale of the products in question[.] Therefore, there will be no further financial impact to KV related to the products to be destroyed.

Id. at 27-28, para. 99. KV's common stock closed at $21.70 on July 29, 2008. Id. at 28, para. 100.

"On August 11, 2008, KV filed with the SEC its Form 10-Q for the first quarter of fiscal [year] 2009 end[ing] June 30, 2008. . . . KV announced that compared to the first quarter fiscal [year] 2008, in the first quarter 2009[,] net revenues increased more than 30%, gross profits increased 39%, and Company profits increased 102%." (Doc. #72, at 28, para. 101). In a press release issued that same day, KV reported that:

The Company currently expects to report net revenue of between $650 million and $675 million and net income per diluted Class A share of between $1.65 and $1.75 for the fiscal year ending March 31, 2009. Although KV historically has not issued revenue or earnings guidance, in light of potential competitive challenges related to certain . . . products, as well as new product launches planned during fiscal [year] 2009 and their potential impact on fiscal [year] 2009 financial performance, we are providing guidance for the current fiscal year. It is not the Company's

- 13 -

expectation to further update this guidance during the course of the fiscal year or for future periods. . . .

**The Company was notified last week that the Audit Committee of its Board of Directors has recently commenced an independent inquiry into allegations made by sources not identified to management regarding alleged misconduct by management of the Company.** Since 1995, the Company has had in place a Standard of Business Ethics Policy. As part of this policy, an employee is encouraged to report, independent of management and for any reason, any action an employee suspects to be contrary to this code of ethics. Management has not been advised as to the specifics of the allegations and is not in a position to make an informed determination as to whether the allegations have any merit. **Management is not aware of and does not believe that there has been any misconduct that would have a material impact on the Company's financial results.** Management is cooperating fully with the Committee.

Id. at 28-29, para. 104-105 (emphasis in original). The press release included the

following statement from M. Hermelin:

During the first quarter, KV delivered sharply improved profits and nearly $16.0 million in cash flow from operating activities. Performance was led by strong growth at ETHEX Corporation and continued competitiveness of our category-leading branded products at Ther-Rx. Both of these businesses are poised for further growth over the balance of fiscal [year] 2009 helped by recent introductions like metoprolol succinate extended-release tablets and our branded transdermal spray Evamistä. The Company's pipeline remains strong as well, with expectations of receiving one NDA approval and at least six ANDA approvals during the current fiscal year.

(Doc. #72, at 28, para. 103). That same day, KV common stock closed at $22.36 per

share. Id. at 29, para. 107.

On October 23, 2008, the Board "approved indemnification agreements for each

of the Company's Directors[, which] provide[ed] that KV shall indemnify the Directors

against all costs, judgments, penalties, fines, liabilities, and amounts paid in

settlement for any action taken by any Director in his or her official capacity." Id. at

30, para. 109.

Then, "[o]n or about November 10, 2008, KV issued a press release announcing that its Form 10-K filing for the quarter ending September 30, 2008 would be delayed due to its Audit Committee's continuing investigation into allegations of management misconduct." Id. at para. 110.  That same day, KV's common stock closed at $15.70 per share, falling $0.45 from its previous close of $16.15 per share.  Id. at para 111. Then, on November 11, 2008, KV's common stock closed at $15.40 per share, and, on November 12, 2008, KV's common stock closed at $14.24 per share.  Id.

On November 13, 2008, KV filed a Form 12-2b, announcing:

> [T]he Audit Committee of [KV], with the assistance of legal counsel, including FDA regulatory counsel, and other advisers, is conducting an internal investigation with respect to a range of specific allegations, from multiple sources, involving, among other items, FDA regulatory and other compliance matters and management misconduct. One previously announced FDA recall of a Company product is associated with the investigation as are two new recalls involving several products dated November 7 and November 10, 2008.  The Audit Committee presently intends to complete its investigation, deliver its findings and issue its recommended remedial actions before the end of December 2008.  The timing of the review will delay the filing of the Company's Form 10-Q for the quarter end[ing] September 30, 2008.

Id. at 31, para. 112.  KV also disclosed: (1) adverse information concerning its financial results for the second quarter of the fiscal year 2009; (2) an estimated loss of $0.06 per share for the second quarter of fiscal year 2009, a decline of $0.76 per share from the previous year; (3) second quarter fiscal year 2009 net revenues declined 16%, down $28.6 million, as compared to the previous fiscal year; (4) ETHEX revenues declined $20.0 million due to the guaifenesin/hydrocone product discontinuations and $18.0 million due to unshipped orders caused by "manufacturing interruptions and inefficiencies"; and (5) that it planned to "withdraw[] the revenue and earnings guidance for fiscal [year] 2009 issued in August 2008, in which KV announced that it expected to report net revenue of between $650 million and $675

million and net income per diluted Class A share of between $1.65 and $1.75 for [fiscal year] 2009." (Doc. #72, at 32, para. 113-15).

On November 13, 2008, the price of KV's common stock closed at $5.90, falling $8.36 per share from its previous close of $14.26. Id. at para. 116. "This represented a drop of approximately 59% on trading volume of over 6.6 million shares, which [was a] volume increase of approximately 3,300% compared to trading volume [on November 23], and more than 4,700% compared to the average trading volume for the prior seven days." Id.

In early December 2008, M. Hermelin's wife and his son, D. Hermelin, voluntarily ended their employment with KV. Id. at 34, para. 124.

On December 2, 2008, Joseph Mas filed a class-action complaint against KV and its executive officers on behalf of purchasers of KV securities between February 15, 2008 and November 12, 2008, alleging that KV and several of KV's executives had issued materially false and misleading statements, regarding KV's compliance with federal regulations that govern the manufacture and marketing of certain generic drug products containing guaifenesin as well as KV's current and future financial prospects. See Public Pension Fund Group v. KV Pharm. Co., et al., No. 4:08-CV-1859 (CEJ).

On December 4, 2008, KV's Class A common stock closed at $3.85 and KV's Class B common stock closed at $3.89. (Doc. #72, at 32, para. 117).

On December 5, 2008, M. Hermelin retired as KV's CEO. Id. at 33, para. 120. "Later that day, KV issued its own announcement, stating that the Board of Directors, acting upon the recommendation of the Audit Committee, terminated the employment agreement of defendant Marc Hermelin 'for cause.'" Id. at para. 121. "Under Marc Hermelin's employment contract, 'for cause' was described as the 'employee has committed a breach of a fiduciary duty, embezzlement, larceny, or has willfully failed

- 16 -

to perform his duties.'" Id. at para 122.   "The Board of Directors also removed Defendant Marc Hermelin as Chairman of the Board of Directors and CEO, and appointed David A. Van Vliet to serve as interim CEO[.]" Id. at 34, para. 123.

"On December 23, 2008, KV announced that it was suspending shipments of all FDA approved drugs in tablet form[, which] accounted for $159 million of KV's $602 million in revenue [for the fiscal year] 2008." Id. at para. 126 (citation omitted).  KV explained that:

> [Their decision was] a precautionary measure to allow KV to expeditiously review and enhance comprehensively the company's manufacturing and quality systems, and to implement efficiency improvements in its production facilities. . . .
>
> [We are] unable to determine when distribution of tablet-form products will resume, or estimate what the financial impact of the recall and suspension will be.

Id. at 34, para. 127-28.  Additionally, "KV announced [a] recall of a shipment of its painkiller hydromorphone due to a report of an oversized tablet." Id. at 129.  KV Class A common stock then fell nearly 50% to $2.71 per share from the previous day's close of $5.39 per share.  (Doc. #72, at 34, para. 130).  The next day, KV common stock closed at $1.99.  Id.

On January 9, 2009, Herman Unvericht filed a class-action complaint against KV and its executive officers on behalf of purchasers of KV securities between February 15, 2008 and November 12, 2008, claiming violations of the federal securities laws. See Herman Unvericht v. KV Pharm. Co., et al., No. 4:09-CV-61 (CEJ).  Then, on January 21, 2009, Norfolk County Retirement System filed a class-action complaint against KV and its executive officers on behalf of purchasers of KV securities between

May 31, 2007 and November 12, 2008, claiming violations of the federal securities laws.[8]  See Norfolk County Ret. Sys. v. KV Pharm. Co., et al., No. 4:09-CV-138 (CEJ).

On January 22, 2009, KV suspended the manufacture and shipment of all of its products, with the exception of those products that it distributed but did not manufacture.  Id. at 45, para. 131.  Four days later, "KV announced its suspension of all manufacturing and shipping of its products[, and] that it was initiating a nationwide recall of most of its products."  Id. at para. 132.  Additionally, KV explained that:

[A]s of December 31, 2009, it may be out of compliance with one or more of the covenants in its revolving line of credit agreement, from which it had borrowed approximately $30 million. . . . [I]f lenders did not provide a waiver, KV's outstanding obligations under the credit agreement would be immediately become due. . . .

[A] Special Committee of the Board [was formed] in response to a series of putative class action stockholder lawsuits that alleged violations of the federal securities laws by KV and the receipt of an informal inquiry from the SEC.

(Doc. #72, at 35, para 133-34).  Finally, KV announced that "it was responding to inquires from the United States Attorney for the Eastern District of Missouri and the FDA[,] it had fired its Senior Vice President and General Counsel Gregory Bentley[, and] that Gestiva, a drug that prevents pre-term births, would again be delayed because the FDA wanted more data and another clinical trial."  Id. at para. 135-37.  KV's Class A stock then closed at $0.51, falling $1.73 from its previous close of $2.24.  Id. at 36, para. 138.  On January 30, 2009, KV discarded its existing inventory and some of its raw materials.  Id. at para. 139.

_____

[8]In a Memorandum and Order dated April 15, 2009, the Court, *inter alia*, consolidated the three securities class actions and appointed the Public Pension Fund Group as lead plaintiffs. Then, on February 22, 2010, the Court granted the defendants' motions to dismiss lead plaintiffs' amended complaint.  See Public Pension Fund Group, et al., v. KV Pharm., et al., 4:08-CV-1859 (CEJ).

In February 2009, the FDA issued KV a warning letter.  Id. at 16, para. 58.  On February 2, 2009, the FDA issued KV a Form FDA 483 ("2009 Form 483"), "setting forth its observations concerning product quality and deficiencies in the Company's compliance with cGMP regulations."  Id. at 36, para. 140.

On February 3, 2009, Harold S. Crocker filed the instant action against KV and its executive officers on behalf of all participants of the Plan, claiming numerous violations of ERISA.  See Harold S. Crocker, et al. v. KV Pharm. Co., et al., No. 4:09-CV-198 (CEJ).  On February 9, 2009, Anna Bodnar filed a class action complaint against KV and its executive officers, see Anna Bodnar v. KV Pharm. Co., et al., 4:09-CV-222 (CEJ), and, on February 24, 2009, Heather Knoll filed the third ERISA class action complaint against KV and its executive officers, see Heather Knoll v. KV Pharm. Co., et al., 4:09-CV-297 (CEJ).

On March 2, 2009, the United States filed a complaint for permanent injunction against several defendants, including KV, ETHEX, Ther-Rx, and four KV executives, including M. Hermelin.  (Doc. #72, at 36, para. 141).  In the complaint, the government alleged that the FDA investigators documented thirty-five deviations, including KV's:

a.    Failure to follow the responsibilities and procedures applicable to the quality control unit, as required by 21 C.F.R. § 211.22(d);

b.    Failure to establish control procedures to validate the performance of those manufacturing processes that may be responsible for causing variability in the characteristics of in-process material and the drug market, as required by 21 C.F.R. § 211.110(a);

c.    Failure to make written records of investigations into unexplained discrepancies and investigations of a batch or any of its components to meet specifications, as required by 21 C.F.R. § 211.192;

d.    Failure to review and approve drug product production and control records by the quality control unit to determine compliance with all

- 19 -

established, approved written procedures before a batch is relased or distributed, as required by 21 C.F.R. § 211.192;

e.      Failure to review and approve changes to written procedures by the quality control unit, as required by 21 C.F.R. § 211.100(a);

f.      Failure to clean, maintain, and sanitize equipment and utensils at appropriate intervals to prevent contamination that would alter the safety, identity, strength, quality or purity of the drug product, as required by 21 C.F.R. § 211.67 (a); and

g.      Failure to follow written production and process control procedures in the execution of production and process control functions, as required by 21 C.F.R. § 211.100(b).

Id. at 36-37, para. 141.  The government also claimed that KV had violated the

following sections of the Food and Drug Act:

a.      21 U.S.C. § 331(a), by introducing and delivering for introduction into interstate commerce articles of drug, as defined by 21 U.S.C. § 321(g)(1), that are adulterated within the meaning of 21 U.S.C. § 351(a)(2)(B).

b.      21 U.S.C. § 331(k), by causing the adulteration, within the meaning of 21 U.S.C. § 351(a)(2)(B), of articles of drug, as defined by 21 U.S.C. § 321(g)(1), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

c.      21 U.S.C. § 331(d), by introducing or causing to be introduce[d] into interstate commerce unapproved new drugs.

d.      21 U.S.C. § 331(a), by introducing and delivering for introduction into interstate commerce articles of drug, as defined by 21 U.S.C. § 321(g)(1), that are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

e.      21 U.S.C. § 331(k), by causing the misbranding within the meaning of 21 U.S.C. § 352(f)(1), of articles of drug, as defined by 21 U.S.C. § 321(g)(1), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

(Doc. #72, at 37, para. 142).  In the complaint, the government explained that "the

deficiencies observed by the FDA in the February 2009 inspection were the same as,

or similar to, prior violations [that] the FDA observed in inspections in January 2004,

- 20 -

January 2005, March 2006, April 2007, March 2008, [and] August 2008[.]" Id. at 37-38, para. 143.

"On March 6, 2009, KV announced that it entered a consent decree with the FDA[, and KV agreed that] an independent consultant would review [its] facilities to certify compliance with FDA regulations[, and that it would] not market products it manufactur[ed] until it [had] satisfied certain requirements designed to demonstrate compliance with FDA's cGMP regulations." Id. at 38, para. 144.

In a Memorandum and Order dated May 7, 2009, the Court consolidated the lawsuits filed by Anna Bodnar and Heather Knoll with this action.

On June 2, 2009, KV announced that:

[It] estimate[d] that costs for the multi-product recall, disposal of products, and potential claims by customers who had to procure products that KV could not supply will be $140-150 million for the fiscal year [ending] March 31, 2009. . . .

[W]hile the Audit Committee's investigation has been substantially completed, the Audit Committee has referred certain matters with a potential financial reporting impact from its investigation to management for resolution.  Until these matters can be resolved, KV . . . will not be in a position to file its Annual Report for the fiscal year end[ing] March 31, 2009 with the SEC.

(Doc. #72, at 38, para. 145-46).

On June 23, 2009, the Audit Committee revealed the following findings:

a.      instances of noncompliance with FDA and other healthcare regulations and deficiencies in KV's regulatory compliance polices and procedures;

b.      deficiencies in KV's financial analysis and budgeting controls and procedures;

c.      deficiencies in KV's [Human Resource] functions and employment policies and procedures; and

d.      deficiencies in the conduct of certain members of Senior Management in, among other things, their interaction with the Board.

- 21 -

Id. at 38-39, para 147.  KV then announced that the Audit Committee approved a

recovery plan for KV that would:

   a.   strengthen corporate governance and enhance Board oversight;

   b.   strengthen and enhance compliance with FDA and related
        regulatory requirements;

   c.   strengthen and enhance financial and accounting controls and
        procedures;

   d.   strengthen and enhance policies and practices in the employment
        area; and

   e.   strengthen and enhance policies with federal and state legal and
        regulatory requirements governing pharmaceutical sales and
        marketing activities.

Id. at 39, para. 148.

      On June 26, 2009, plaintiffs filed their amended complaint, alleging that all of

the defendants breached their duties of loyalty and prudence by failing to prudently

and loyally manage the Plan assets (Count I); all of the defendants breached their duty

to inform by failing to provide complete and accurate information to the Plan

participants and beneficiaries (Count II); KV and the Director Defendants breached

their fiduciary duties by failing to monitor the other Plan fiduciaries (Count III); and

that all of the defendants breached their co-fiduciary duties by enabling and/or causing

their co-fiduciaries to violate ERISA (Count IV).  Additionally, plaintiffs request that the

Court certify a class comprising of Plan participants who owned KV stock between

February 2, 2003 to the present.  The defendants now move to dismiss plaintiffs'

amended complaint.  See (Doc. #86; #88; #91; #93; #94).

      IV.   Legal Standard

      The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure is to test the legal sufficiency of the complaint.  The factual allegations

of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." Bell Atlantic Corp. v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1965 (May 21, 2007) citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp., 127 S. Ct. at 1974. See also id. at 1969 ("no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), "has earned its retirement."). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

## V.    Discussion

Plaintiffs allege that the defendants breached several of their fiduciary duties by imprudently investing the Plan assets in KV common stock. To establish an ERISA claim for breach of a fiduciary duty, "plaintiffs must allege that (1) defendants were fiduciaries of the plan who, (2) acting within their capacities as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA fiduciary duty." *In re* Pfizer Inc. ERISA Litig., No. 04 Civ. 10071(LTS)(JFE), 2009 WL 749545, *6 (S.D.N.Y. Mar. 20, 2009) (citing 29 U.S.C. § 1109; Pegram v. Hedrich, 530 U.S. 211, 222-224, 120 S.Ct. 2143, 147 L.Ed.2d 168 (2000)); see also Blankenship v. Chamberlain, No. 4:08CV01168 ERW, 2010 WL 427764, *7 (E.D. Mo. Feb. 1, 2010) (reciting elements).

### A.    Defendants' Fiduciary Status Under ERISA

ERISA provides that:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The Unites States Supreme Court explains that "ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." Mertens v. Hewitt Assocs., 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (emphasis in original) (citing 29 U.S.C. § 1002(21)(A)). Likewise, the Eighth Circuit holds that "[t]he term fiduciary is to be construed broadly[.]" Olson v. E.F. Hutton & Co., Inc., 957 F.2d 622, 625 (8th Cir. 1992) (first alternation in original) (quoting Consol. Beef Indus. v. New York Life Ins. Co., 949 F.2d 960, 963 (8th Cir. 1991)). The appellate court further explains that "[a] court must ask whether a person is a fiduciary with respect to the particular activity in question." Maniace v. Commerce Bank of Kansas City, N.A., 40 F.3d 264, 267 (8th Cir. 1994) (citations omitted). "[A]nswering questions about a plan, noting changes in the plan, [and] disseminating information directly to plan participants concerning their rights within the plan . . . are classic fiduciary activities." Anderson v. Resolution Trust Corp., 66 F.3d 956, 960 (8th Cir. 1995) (second alternation in original) (citing Pickering v. USX Corp., 809 F.Supp. 1501, 156-68 (D. Utah 1992)).

1. **KV'S Fiduciary Status**

Under Eighth Circuit precedent, one who "is vested with and exercises discretionary authority and control as the plan sponsor and named administrator . .

. is a fiduciary under 29 U.S.C. § 1102(21)(A)[.]" Harold Ives Trucking Co. v. Spradley & Coker, Inc. 178 F.3d 523, 526 (8th Cir. 1999). Here, plaintiffs allege, and KV does not dispute, that KV is the Plan administrator and sponsor. Additionally, plaintiffs allege that KV "select[ed] investment options or alternatives in the Plan[,] retained the right to change or remove any investment options[, and] monitor[ed] the performance of the Plan's investment funds, including the KV Stock Fund." (Doc. #72, at 10, para. 32). The Court believes that plaintiffs have pled sufficient facts to establish that KV is a fiduciary of the Plan.

## 2. Director Defendants' Fiduciary Status

Plaintiffs argue that, because fiduciary status is a fact-sensitive inquiry, it is inappropriate for the Court to determine the fiduciary status of the Director Defendants at the motion to dismiss stage. See (Doc. #102, at 29-33). To support their contention, plaintiffs cite numerous cases; however, the majority of the cases predate Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), in which the Supreme Court held that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. The Supreme Court also explained that "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original). Plaintiffs cite to one post-Iqbal case, *In re* Merck & Co., Inc., No. Civ.A. 08-CV-1947DMC, 2009 WL 2834792, *4 (D.N.J. Sept. 1, 2009), in which the district court (1) determined the defendants' fiduciary statutory; and (2) found that the plaintiffs' "complaint [was] replete with allegations that [d]efendants had management, oversight, and investment authorities with respect to the Plans[.]" Id. (emphasis added).

- 25 -

In this case, plaintiffs allege that the Director Defendants "were fiduciaries . . . in that they exercised discretionary authority or discretionary control respecting [the] management of the Plan, exercised authority or control respecting management or disposition of Plan assets and/or had discretionary authority or discretionary responsibility in Plan administration."  (Doc. #72, at 12, para. 40).  Under the Iqbal standard, the Court finds that these bare allegations are insufficient in that they constitute nothing more than a recitation of the ERISA statutory language.

Additionally, plaintiffs allege that the Director Defendants are fiduciaries because they signed several SEC filings that contained false and misleading representations. Specifically, plaintiffs assert that "the Director Defendants signed the Form 10-Ks filed with the SEC on March 26, 2008 and June 27, 2008 on behalf of KV[, and that] Defendants Mark Hermelin (as Principal Executive Officer) and Kanterman (as Principal Financial Officer) also signed 10-Ks on behalf of KV."  (Doc. #72, at 12, para 41). Signing an SEC filing does not create a fiduciary status.  See *In re WorldCom, Inc.*, 263 F.Supp.2d 745, 766 (S.D.N.Y. 2003) ("Those who prepare and sign SEC filings do not become fiduciaries through those acts, and consequently, do not violate ERISA if the filings contain misrepresentations."); *In re* Sprint Corp. ERISA Litig., 388 F.Supp.2d 1207, 1226 (D. Kan. 2004) (quoting WorldCom, 263 F.Supp.2d at 766); Bendaoud v. Hodgson, 578 F.Supp.2d 257, 277 (D. Mass. 2008) ("Merely signing a securities filing, even one that the signer knows will be incorporated into an ERISA document, does not create ERISA fiduciary status; it is a solely corporate act.").

Based on the foregoing, the Court concludes that plaintiffs have failed to plead sufficient facts that the Director Defendants are fiduciaries of the Plan.

### 3.    Committee Defendants' Fiduciary Status

Plaintiffs also contend that it is inappropriate for the Court to determine the fiduciary status of the Committee Defendants. As discussed above, other courts have made such a factual determination at the motion to dismiss stage. Thus, the Court will determine whether plaintiffs have pleaded sufficient facts to establish that the Committee Defendants are fiduciaries of the Plan.

In their amended complaint, plaintiffs allege that KV "has made no formal delegations of ERISA fiduciary responsibilities as Plan Administrator[.]" (Doc. #72, at 12, para. 41). Plaintiffs also assert that "each [of the Committee Defendants] had discretionary authority and control regarding the administration and management of the Plan and/or Plan assets[.]" Additionally, plaintiffs allege that the Committee Defendants "possessed the full authority in their absolute discretion to determine all questions of eligibility for entitlement to Plan benefits[, and] select[ed], evaluat[ed], monitor[ed], and alter[ed] investment alternatives offered by the Plan." (Doc. #72, at 12-13, para. 42). The Committee Defendants argue that Confer v. Custom Eng'g Co., 952 F.2d 34, 37 (3d Cir. 1991), requires dismissal of plaintiffs' claims against them because (1) KV did not designate them as fiduciaries and (2) plaintiffs failed to allege each defendant's individual discretionary role with respect to the Plan. (Doc. #89, at 15-17; #109, at 9-14).

In Confer, the Third Circuit ruled that, "when an ERISA plan names a corporation as a fiduciary, the officers who exercise discretion on behalf of that corporation are not fiduciaries[.]" Id. The Eighth Circuit has not yet addressed the Confer holding. Also, the Court believes that, although KV did not designate the Committee Defendants as fiduciaries, plaintiffs claim that each of them had the discretionary authority to ask questions about the Plan and that each of them managed the investments of the Plan assets. Thus, the Court finds that plaintiffs have pled sufficient facts to establish that

each of Committee Defendant exercised discretionary authority.  See *In re* ADC
Telecomms., Inc., ERISA Litig., 03-2989 ADM/FLN, 2004 WL 1683144, *5 (D. Minn.
July 26, 2004) ("Without the opportunity for discovery, [the Court believes that]
Plaintiffs cannot fairly be expected to ascertain all the factual details of [the
Committee] Defendants' precise responsibilities and actions. [W]hether the evidence
will bear out the allegations [is] a separate question addressable on summary
judgment.").

Having determined that plaintiffs alleged insufficient facts to establish that D.
Hermelin and M. Hermelin are fiduciaries of the Plan, the Court will dismiss all of
plaintiffs' claims against those defendants.  The next issue is whether KV, Kanterman,
Mitchell,[9] Chibnall, Hughes, and Tichner breached fiduciaries duties owed to plaintiffs.

## B.    Breach of Fiduciary Duties

Section 1109 of ERISA provides, in relevant part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of
> the responsibilities, obligations, or duties imposed upon fiduciaries by this
> subchapter shall be personally liable to make good to such plan any
> losses to the plan resulting from each such breach, and to restore to such
> plan any profits of such fiduciary which have been made through use of
> assets of the plan by the fiduciary, and shall be subject to such other
> equitable or remedial relief as the court may deem appropriate, including
> removal of such fiduciary.   A fiduciary may also be removed for a
> violation of section 1111 of this title.

> No fiduciary shall be liable with respect to a breach of fiduciary duty
> under this subchapter if such breach was committed before he became
> a fiduciary or after he ceased to be a fiduciary.

---

[9]Plaintiffs allege that defendants Kanterman and Mitchell were a part of the Director
Defendants and Committee Defendants.  See (Doc. #72, at 5-6, para. 11, 13).  Because
the Court has determined that plaintiffs have failed to plead sufficient facts to establish that
the Director Defendants are fiduciaries of the Plan, the Court will only consider Kanterman
and Mitchell in their role as Committee Defendants.

29 U.S.C. § 1109(a)-(b).  Having determined that KV and the Committee Defendants are fiduciaries of the Plan, the Court will now consider whether these defendants breached their fiduciary duties.

### 1.    Imprudent Investment Claim (Count I)

In Count I of their amended complaint, plaintiffs allege that KV and the Committee Defendants breached the duty by investing the Plan assets in KV common stock.  Pursuant to ERISA, the duty of prudence provides that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . .
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1).

### a.    The Applicability of the *Moench* Presumption of Prudence

First, KV and the Committee Defendants urge the Court to dismiss plaintiffs' prudence claim because the allegations in their amended complaint fail to overcome the Moench presumption of prudence.  Plaintiffs maintain that the Moench presumption does not apply because (1) ERISA does not include such presumption; (2) courts only extend the Moench presumption to fiduciaries of Employment Stock Ownership Programs (ESOPs); and (3) the Moench presumption is an evidentiary standard that should not be applied at the motion to dismiss stage.

An eligible individual account plan (EIAP) is "an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an [ESOP]; or (iii) a money purchase plan which [invests] primarily in qualifying employer securities.'" 29 U.S.C. § 1107(d)(3)(A). "An ESOP is one of several types of . . . 'EIAPs'[,]" which is "designed to primarily invest in employer securities." Edgar v. Avaya, Inc., 503 F.3d 340 (5th Cir. 2007) (citing 29 U.S.C. § 1107(d)(6)). The Plan at issue in the instant action is a non-ESOP EIAP. See (Doc. #72, at 8, para. 22; #102, at 37, 39).

Although ERISA does not contain a presumption of prudence for fiduciaries, the Third Circuit, in Moench v. Robertson, held that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision." 62 F.3d 553, 571 (3d Cir. 1995). The Sixth Circuit has "adopt[ed] the Third Circuit's holding[, explaining that it strikes the] proper balance between the purpose of ERISA and the nature of ESOPs[.]" Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995).

In Avaya, the Third Circuit extended the Moench presumption to all EIAPs, including non-ESOP EIAPs. 503 F.3d 340 at 347. The Fifth Circuit then held that "[t]he Moench presumption logically applies to any allegations of fiduciary duty breach for failure to divest" all types of EIAPs. Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 254 (5th Cir. 2008). Moreover, although the Ninth Circuit has not yet adopted the Moench presumption, that court has "note[d] that [all] EIAPs . . . are treated the same for the purpose of fiduciary duty analysis." Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1098 n.3 (9th Cir. 2004) (citations omitted).

Although the Eighth Circuit has not yet adopted the Moench presumption of prudence, the Court finds the Third Circuit's reasoning in both Moench and Avaya is persuasive. Additionally, the Court believes that the Moench presumption is not an

evidentiary standard, and the presumption may be applied at the motion to dismiss stage.  See Ward v. Avaya, Inc., 299 Fed. Appx 196, 199 n.4 (3d Cir. 2008) (stating that the presumption of prudence applies at the motion to dismiss stage);  In re Ford Motor Co. ERISA Litig., 590 F.Supp.2d 883, 893 n.1 (E.D. Mich. 2008) (the Moench "presumption is not a mere evidentiary standard, but instead is a substantive rule of law that can be applied at the motion-to-dismiss stage);  In re Dell, Inc. ERISA Litig., 563 F.Supp.2d 681, 689 (W.D. Tex. 2008) ("The Court must . . . determine at the motion to dismiss stage whether the Plaintiffs have plead facts which, taken as true, could overcome the Moench presumption.");  In re Avon Prods, Inc. Sec. Litig., No. 05 Civ. 6803 (LAK)(MHD), 2009 WL 848083, at *10 (S.D.N.Y. Mar. 3, 2009) ("most courts" have recognized that the Moench presumption of prudence "imposes a pleading burden on the plaintiff to allege facts, that if credited, would justify overcoming the presumption.");  In re Citigroup ERISA Litig., No. 07-9780, 2009 WL 2762708, at *16 (S.D.N.Y. Aug. 31, 2009) ("Joining [the] trend, this Court will apply the Moench presumption in conjunction with defendants' motion to dismiss the complaint in this action.");  In re Harley-Davidson, Inc., Sec. Litig., Civil Case No. 05-C-0547-CNC, 2009 WL 3233747, *10 n.5 (E.D. Wis. Oct. 8, 2009) ("The court reject[ed plaintiff's] contention that application of a discretionary standard is somehow inappropriate at the motion to dismiss stage.").

###     b.     Rebutting the Moench Presumption

To overcome the Moench presumption of prudence, "plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was not in keeping with the settlor's expectations of how a prudent trustee would operate."  Moench, 62 F.2d at 571.   The District of New Jersey in In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig. noted that:

> [T]o meet this standard on the pleadings, the facts alleged must depict the kind of "dire situation" at the subject company which would require plan fiduciaries to disobey plan terms to invest in company stock so that they might satisfy their prudent investment obligation to plan participants under ERISA. Facts that could indicate that plan fiduciaries abused their discretion by continuing to invest in company stock include, as was the case in Moench, a "precipitous decline in the price of [the employer's] stock," together with allegations that plan fiduciaries knew of the stock's "impending collapse" and the conflicted status of the fiduciaries. The [Avaya] court added, however, that it did "not interpret Moench as requiring a company to be on the brink of bankruptcy" before requiring a fiduciary to deviate from plan terms.

MDL No. 16 1658 (SRC), 2009 WL 790452, *3 (D.N.J. Mar. 23, 2009) (internal citations omitted).

In Merck, the plaintiffs alleged that the plan fiduciaries "fail[ed] to invest and manage Plan assets prudently as required by ERISA." Id. One day after Merck withdrew its product Vioxx from the market, the price of Merck stock plunged 27%. Id. at *2. Over the course of the next month, the price of Merck stock declined an additional 13%. Id. The plaintiffs also asserted that, "after rejecting an initial FDA recommendation to add to [the] product label a warning of increased risk of a cardiovascular thrombotic event, Merck revised the label in 2002 to address [only] the possibility of that risk." Id. at 4 (emphasis added). However, the defendants allegedly "continued to promote Vioxx as safe, sales increased, and the company's stock price rose[.]" Id. The plaintiffs claimed that the "[d]efendants knew, or should have known, that Merck stock was artificially inflated as a result of undisclosed problems and misrepresentations regarding the cardiovascular safety of Vioxx." Id. at *3. The district court held, "as it did on [the d]efendants' motion to dismiss," that the plaintiffs' allegations "depicted a company facing a dire situation[,]" and that the plaintiffs had rebutted the Moench presumption. Id. at *4 (emphasis added). But see Harris v. Amgen, Inc., et al., No. CV 07-5442 PSG (PLAx), 2010 WL 744123, *11 (C.D. Cal. Mar.

2, 2010) (distinguishing Merck and holding that plaintiffs had not rebutted the Moench presumption because the company stock "exhibited a gradual decline of 29% during a period of approximately one and a half years" and that the company's two major products "remained on the market despite [its] trial results and black label warnings").

The Court finds the Merck decision persuasive and applicable to the instant action. In this case, KV common stock allegedly exhibited a gradual decline from February 15, 2008 to December 4, 2008. Then, on December 23, 2008, KV announced the recall of its painkiller hydromorphone. The next day, plaintiffs allege that the price of KV common stock plunged nearly 50%. Over the course of the next month, the price of KV common stock declined an additional 81%. Similar to Merck, which withdrew its most popular product from the market, KV suspended shipment of all its FDA-approved drugs in tablet form. KV stopped manufacturing and distributing all its products on January 26, 2009. Plaintiffs also allege that (1) KV manufactured and distributed unsafe generic drugs despite FDA warnings; (2) the FDA issued KV a Form 483 setting forth KV's non-compliance with the cGMP; and (3) the KV's Audit Committee discovered deficiencies in KV's financial analysis and budget controls. Moreover, as of December 31, 2009, KV was allegedly "out of compliance with one or more of the covenants in its revolving line of credit agreement, from which it had borrowed approximately $30 million." (Doc. #72, at 35, para. 133). Based on the foregoing factual allegations, the Court concludes that plaintiffs have sufficiently alleged that KV was in a dire financial situation, and that plaintiffs have overcome the Moench presumption. The Court, therefore, finds that plaintiffs have pled sufficient facts to establish that KV and the Committee Defendants breached their fiduciary duty of prudence.

### c.      The § 404(c) Safe Harbor Defense

KV and the Committee Defendants next argue that plaintiffs' prudence claim is

barred by the safe harbor defense.  Section 404(c) of ERISA provides that:

> In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account . . .
>
> (i) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and
>
> (ii) <u>no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control</u>, except that this clause shall not apply in connection with such participant or beneficiary for any blackout period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary.

29 U.S.C. § 1104(c) (emphasis added).

KV and the Committee Defendants contend that, even if plaintiffs' allegations

rebut the <u>Moench</u> presumption, the safe harbor defense set forth in 29 U.S.C. §

1104(c) provides an alternative ground for the Court for dismissal of plaintiffs'

prudence claim.  Plaintiffs argue that the safe-harbor defense is an affirmative defense,

and consideration of such defense is premature at the motion to dismiss stage.

To support their contention, KV and the Committee Defendants cite to <u>Heckler</u>

<u>v. Deere & Co.</u>, 556 F.3d 575 (7th Cir. 2009).  In <u>Heckler</u>, the Seventh Circuit notes

that, "[a]lthough normally a district court should not base a dismissal under Rule

12(b)(6) on its assessment of an affirmative defense, that rule does not apply when

a party has included in its complaint 'facts that establish an impenetrable defense to

its claims.'"  <u>Id.</u> at 588 (internal citation omitted).  The complaint in <u>Heckler</u> including

the following allegations:

Paragraph 58 begins by noting that "ERISA §404(c) provides to Plan fiduciaries a 'Safe Harbor' from liability for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts." Paragraph 58 through 61 describe the information that Deere, as a plan fiduciary, was required to furnish. Later, the Complaint has a section entitled "Defendants Non-Compliance with § 404(c)'s Safe Harbor Requirements and Concealment of Its Fiduciary Breaches." Paragraph 91 through 101 specify exactly what Deere and Fidelity allegedly failed to do. For example, paragraphs 91 and 100(c) and (e) accuse them of failing to disclose that Fidelity was engaged in revenue sharing among its different entities. Paragraphs 93 and 100(b) assert that Plan participants did not have complete knowledge of the fees and expenses that were being charged to the Plans and that were reducing their account balances. Paragraphs 95 and 101(i) charge, among other things, that Deere and Fidelity failed to disclose their agreement that Deere would offer only Fidelity-related funds for the Plans.

556 F.3d at 588. Based on these allegations, the Seventh Circuit agreed with the

district court's conclusion that "the Complaint so thoroughly anticipated the safe-

harbor defense that it could reach that issue[.]" Id.

The Court finds that Heckler is distinguishable from the instant case. Unlike the

complaint in Heckler, which included a section heading and numerous paragraphs

explicitly alleging why the safe-harbor defense was inapplicable, here, plaintiffs'

amended complaint includes one paragraph, in which plaintiffs allege:

The Department of Labor's § 404(c) regulations do not apply to the Plan. The regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed material non-public facts regarding the investment from the participant." Accordingly, § 404(c) does not apply here, and Defendants are liable for losses suffered by participants during the Class Period.

(Doc. #72, at 42, para. 158). Without more, the Court believes that plaintiffs' bare

allegations fail to "so thoroughly anticipate the safe-harbor defense." At this stage of

the litigation, the Court finds that it is premature to determine whether the §404(c)

safe-harbor defense bars plaintiffs' prudence claim against KV and the Committee

Defendants.

### d.    Rule 9(b)

Finally, KV and the Committee Defendants claim that plaintiffs' prudence claim

sounds in fraud and fails to meet the heightened pleading requirements set forth in

Federal Rule of Civil Procedure 9(b).    To support their contention, KV and the

Committee Defendants rely on Johnson v. Radian Group, Inc., Civil Action No. 08-

2007, 2009 WL 2137241, at *12 (E.D. Pa. July. 16, 2009). In Johnson, the district

court held that:

> Although Rule 8's pleading requirements apply generally to ERISA claims
> for breach of fiduciary duty, as other courts in [that] circuit have noted,
> to the extent that any claims sound in fraud, they are subjected to the
> heightened pleading requirements of Rule 9(b).  See Urban v. Comcast
> Corp., No. 08-773, 2008 WL 4739519, at *9 (E.D. Pa. Oct. 28, 2008);
> Pietrangelo v. NUI Corp., No. 04-3223, 2005 WL 1703200, at *9 (D.N.J.
> July 20, 2005); In re Ikon Office Solutions, Inc. Sec. Litig., 86 F.Supp.2d
> 481, 488 (E.D. Pa. 2000); accord Caputo v. Pfizer, Inc., 267 F.3d 181,
> 191 (2d Cir. 2001).  Rule 9(b) requires a party alleging fraud or mistake
> to allege with particularity the circumstances constituting fraud or
> mistake.  Fed.R.Civ.P. 9(b).

Id.

Here, in Count I of their amended complaint, plaintiffs allege, *inter alia*, that:

> Throughout the Class Period, the price of the KV stock was artificially
> inflated as a direct result of Defendants' scheme to misrepresent the
> state of . . . KV's manufacturing processes.  During the Class Period, KV
> concealed its violations of FDA regulations by failing to properly
> implement and utilize the Company's internal controls, processes and
> procedures over its manufacturing functions and to attend to the proper
> training of its staff involved with the Company's manufacturing activities.

> Throughout the Class Period, the price of the KV stock was artificially
> inflated as a direct result of Defendants' scheme to misrepresent the
> state of . . . KV's financial and accounting activities.  The financial
> statements issued during the Class Period and the statements that
> Defendants made about them were false and misleading.  Further, the
> financial reports and information were not prepared in conformity with
> GAAP or SEC guidelines, nor was the financial information a fair
> presentation of the Company's operations due to KV's improper
> accounting in violation of GAAP and SEC rules.

> During the Class Period, Defendants continued to invest in company Stock despite the fact that Defendants knew or should have known that Company Stock was not a prudent investment for the Plan or Plan participants and beneficiaries because KV['s] books and records did not report or disclose the Company's substantial manufacturing and financial problems. Had Defendants revealed the truth about the Company's manufacturing processes and financial condition and result to the investment community, Plaintiff and other Class members would not have purchased Company stock or would have purchased shares at a substantially lower price.

(Doc. #72, at 42-43, para 161-63). "Although these [allegations] do not employ the word 'fraud,' [the Court concludes that] they can be read only as averments that [KV and the Committee Defendants] committed fraud, both by affirmative intentional misrepresentations and by intentional omissions." Urban, 2008 WL 4739519, at *9. As such, plaintiffs' allegations are subject to analysis under Rule 9(b).

The Eighth Circuit holds that to satisfy Rule 9(b) "the complaint must allege 'such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" Drobnak v. Anderson Corp., 561 F.3d 778, 783 (8th Cir. 2009) (citation omitted).

Here, plaintiffs allege that KV and the Committee Defendants engaged in "a scheme to misrepresent" KV's financial processes as well as KV's financial and accounting activities. (Doc. #72, at 42-43, para. 162-63). However, plaintiffs fail to explain the specific activities and/or conduct that amounted to a scheme. Plaintiffs repeatedly assert that the Committee Defendants made false and misleading statements, (Doc. #72, at 3-4, para. 3, 29-32, para. 108, 110, 42-43, para. 161-162), but plaintiffs do not allege that the Committee Defendants made any statements regarding KV's operational and financial status. See (Doc. #72, at 23, para. 83, at 28, para. 103). Additionally, plaintiffs allege that KV concealed its FDA violations.

Although plaintiffs cite to KV's press releases and SEC filings in their amended complaint, plaintiffs fail to allege the specific statements in these public announcements that were false and misleading. As such, the Court believes that plaintiffs have failed to plead with sufficient particularity that KV and the Committee Defendants made false and misleading statements omissions as well as concealed material regarding KV's securities. The Court will dismiss plaintiffs' prudence claim against KV and the Committee Defendants.

### 2. Duty of Loyalty Claim (Count I)

Additionally in Count I, plaintiffs allege that KV and the Committee Defendants breached their fiduciary duty of loyalty by continuing to invest in KV stock because the Hermelins maintained a controlling interest in KV. The Eighth Circuit explains that "[a]n ERISA fiduciary must 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries,' 29 U.S.C. § 1104(a)(1)(A), and must comply with the common-law duty of loyalty, including the 'obligation to deal fairly and honestly with all plan members.'" Kalda v. Siouz Valley Physician Partners, Inc., 481 F.3d 639, 644 (8th Cir. 2007) (citations omitted). "The duty [of loyalty] is breached when a plan administrator participates 'knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense.'" Christensen v. Qwest Pension Plan, 462 F.3d 913, 917 (8th Cir. 2006) (citing Varity Corp. v. Howe, 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)).

Plaintiffs allege that KV and the Committee Defendants "had a conflict of interest [that caused them to continue to] invest in [KV] Stock for the Plan." (Doc. #72, at 43, para. 164). "Due to the Hermelin family's controlling ownership of the Company, [plaintiffs claim that] all of the employee fiduciaries held their positions at the will of various members of the CEO's family." Id. As such, plaintiffs assert that "these

fiduciaries failed to exercise independent judgement in the performance of their fiduciary duties and they labored under a conflict of interest that affected their duties as fiduciaries to invest plan assets solely in the interests of the Plan participants and beneficiaries." (Doc. #72, at 43-44). These bare allegations fail to establish that KV, as the Plan administrator, and the Committee Defendants in any way deceived or attempted to deceive the Plan participants and beneficiaries. Moreover, the mere fact that the Hermelin family maintained controlling ownership of KV does not indicate that KV and the Committee Defendants breached their fiduciary duty of loyalty to the Plan participants and beneficiaries. The Court finds that plaintiffs have failed to allege sufficient facts to establish a breach of the duty of loyalty. As such, the Court will dismiss plaintiffs' duty of loyalty claim against KV and the Committee Defendants.

### 3.    Plaintiffs' Nondisclosure Claim (Count II)

In Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009), the

Eighth Circuit wrote:

> ERISA and its associated regulations impose upon fiduciaries extensive and specific obligation of disclosure. These duties are supplemented by the general duty of loyalty under 29 U.S.C. § 1104(a)(1). Courts have interpreted this duty to impose additional obligations of communication and disclosure under certain circumstances. Nevertheless, we are not quick to infer specific duties of disclosure under § 1104 because of the extent of the statutory and regulatory scheme.

> It is uncontroversial that the duty of loyalty requires fiduciaries to "deal fairly and honestly with all plan members," and it is a breach of this duty affirmatively to mislead a participant or beneficiary. Moreover, in some circumstances fiduciaries must on their own initiative "disclose any material information that could adversely affect a participant's interests."

 (internal citations omitted). In Count II of their amended complaint, plaintiffs allege that KV and the Committee Defendants breached their fiduciary duty to inform by failing to provide complete and accurate information to the Plan's participants and beneficiaries regarding KV's operations and  financial status.

KV and the Committee Defendants argue that, because plaintiffs' nondisclosure

claim sounds in fraud, Rule 9(b), not Rule 8(a), should govern this claim. (Doc. #89,

at 27; #92, at 11; #93, at 5). KV and the Committee Defendants again cite Johnson,

2009 WL 2137241, at *12.

> In Count II, plaintiffs allege, *inter alia,* that,:

> The Defendants breached their duty to inform by failing to provide complete and accurate information regarding Company Stock, the extent of the Company's exposure to losses in connection with the Company's deteriorating financial condition, the Company's artificial inflation of the value of the stock, and, generally, by conveying incomplete and inaccurate information about the soundness of investing in Company Stock.

> The Defendants breached their duty to inform by failing to provide complete and accurate information regarding the financial problems and risks of investment in Company Stock until and unless it accurately reported and publicly disclosed its financial condition in its books. These actions and failures caused other Plan fiduciaries and certain participants and beneficiaries to maintain substantial investments in Company Stock at a time when these Defendants knew or should have known that Company Stock was not a prudent investment for the Plan or for its participants and beneficiaries.

(Doc. #72, at 45, para 171-72). Count II of plaintiffs' amended complaint incorporates

plaintiffs' preceding allegations that KV and the Committee Defendants "knew or

should have known that KV's books did not accurately reflect its financial condition[,]

KV was not disclosing . . . its significant financial problems, [and that the] conduct

which these fiduciaries knew or should have known artificially inflated the value of

[KV's stock]." Id. at 3, para. 3. Plaintiffs further claim that KV and the Committee

Defendants failed to disclose the misrepresentations in KV's press releases and SEC

filings. Id., at 3-4, para. 3, 29-31, para. 108, 110. Although plaintiffs' allegations do

not include the word "fraud," the Court believes that these allegations sound in fraud

because plaintiffs allege that KV and the Committee Defendants made

misrepresentations and omissions regarding KV's manufacturing and operations activities, regulatory compliance, and financial performance.

The next issue is whether plaintiffs have pleaded their nondisclosure claim against KV and the Committee Defendants with sufficient particularity. As stated above, the Eighth Circuit holds that to satisfy Rule 9(b) "the complaint must allege 'such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" Drobnak v. Anderson Corp., 561 F.3d at 783. Here, plaintiffs essentially allege that KV and the Committee Defendants made material misrepresentations and omissions regarding KV's operational activities, regulatory compliance, and financial status. Although plaintiffs assert that KV and the Committee Defendants knew or should have known that investing the Plan assets in KV common stock was an imprudent investment, they fail to offer any factual allegations that establish that the defendants possessed such knowledge. The Court, therefore, finds that plaintiffs have failed to allege with sufficient particularity that KV and the Committee Defendants failed to provide complete and accurate information. As such, the Court will dismiss Count II of plaintiffs' amended complaint.

### 4. Plaintiffs' Failure to Monitor Claim (Count III)

In Count III, plaintiffs alleges that KV[10] failed to monitor the investment fiduciaries Does 1-40. (Doc. #72, at 46, para. 177). "Under ERISA, fiduciaries who have appointed other fiduciaries have a continuing duty to monitor the actions of the appointed fiduciaries." In re Bausch & Lomb Inc. ERISA Litig., No. 06-CV-6297, 2008

---

[10]In Count III, plaintiffs also allege that the Director Defendants breached their fiduciary duty to monitor the alleged investment fiduciaries. Because the Court has determined that the plaintiffs failed to plead sufficient facts to establish that the Director Defendants are fiduciaries of the Plan, the Court will only address Count III with respect to KV.

WL 5234281, *10 (W.D.N.Y. Dec. 12, 2008) (citations omitted). "[T]he duty to monitor also includes a duty to take action upon discovery that appointed fiduciaries are not performing properly." Bausch & Lomb, 2008 WL 5234281, *10 (citation omitted). "Plaintiffs must allege facts that the (1) entity charged with the breach was responsible for appointing and removing fiduciaries responsible for fiduciary conduct in question; and (2) entity charged with this duty to monitor also had knowledge of or participated in fiduciary breaches by the appointees." Id.

Here, plaintiffs assert in Count II that KV had the authority to appoint Plan fiduciaries, and that KV failed to monitor the investment fiduciaries. (Doc. #72, at 46). Plaintiffs, however, also allege that KV actually "made no formal delegations of ERISA fiduciary responsibilities as Plan Administrator[.]" (Doc. #72, at 12, para. 41) (emphasis added). Although plaintiffs allege that KV was "responsible for . . . appointing, monitoring, and . . . removing Plan fiduciaries[,]" (Doc. #72, at 46, para. 176), the Court has already determined that plaintiffs' amended complaint fails to state claims against KV and the Committee Defendants for breach of their fiduciary duty of prudence, loyalty, and disclosure. The Court finds that plaintiffs have failed to plead sufficient facts to establish the second element of the Bausch & Lomb test. Thus, the Court concludes that plaintiffs have failed to state a claim for failure to monitor.

In Count III, plaintiffs also allege that KV is liable for the other defendants' breaches of their fiduciary duties under the doctrine of *respondeat superior*. (Doc. #72, at 47, para. 180). "However, as discussed above, because plaintiffs have not been able to establish a basis for fiduciary breach claims against [the Committee Defendants, KV] cannot vicariously be subject to liability which does not exist." Bausch & Lomb, 2008 WL 5234281, *11 (citation omitted).

In summary, the Court will dismiss Count III of plaintiffs' amended complaint.

### 5.    Plaintiffs' Co-Fiduciary Claim (Count IV)

Section 1105 of ERISA provides:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowing undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enable such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).  A "claim of co-fiduciary liability . . . must co-exist with some breach by a fiduciary of their duties under ERISA."   Bausch & Lomb, 2008 WL 5234281, *11.

In Count IV of their amended complaint, plaintiffs allege that KV and the Committee Defendants breached their co-fiduciary duties under § 1105(a).  (Doc. #72, at 48).  The Court has already determined that plaintiffs have failed to allege that KV and the Committee Defendants breached any of their fiduciary duties.  Therefore, the Court will dismiss Count IV of plaintiffs' amended complaint.  See Bausch & Lomb, 2008 WL 5234281, *11 (dismissing plaintiffs' co-fiduciary liability claim because "[p]lainitffs' complaint fail[ed] to set for an adequate claim that any of the fiduciaries breached their fiduciary duties under ERISA[.]") (citing Avaya, 2006 WL 1084097, at *12); Johnson, 2009 WL 2137241, *24).

Accordingly,

**IT IS HEREBY ORDERED** that the motion of defendant David S. Hermelin to dismiss plaintiffs' consolidated amended complaint [Doc. #86] is **granted**.

- 43 -

**IT IS FURTHER ORDERED** that the motion of defendants Gerald R. Mitchell, KV Pharmaceutical Company, Melissa Hughes, and Mary Ann Tichner to dismiss plaintiffs' consolidated amended complaint [Doc. #88] is **granted**.

**IT IS FURTHER ORDERED** that the request of defendants Gerald R. Mitchell, KV Pharmaceutical Company, Melissa Hughes, and Mary Ann Tichner for an oral argument on their motion to dismiss plaintiffs' consolidated amended complaint [Doc. #90] is **denied as moot**.

**IT IS FURTHER ORDERED** that the motion of defendant Ronald J. Kanterman to dismiss plaintiffs' consolidated amended complaint [Doc. #91] is **granted**.

**IT IS FURTHER ORDERED** that the motion of defendant Richard H. Chibnall to dismiss plaintiffs' consolidated amended complaint [Doc. #93] is **granted**.

**IT IS FURTHER ORDERED** that the motion of defendant Marc S. Hermelin to dismiss plaintiffs' consolidated amended complaint [Doc. #94] is **granted**.

**IT IS FURTHER ORDERED** that defendant Marc S. Hermelin's request for an oral argument on his motion to dismiss plaintiffs' consolidated amended complaint [Doc. #96] is **denied as moot**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file a second notice of supplemental authority [Doc. #123] is **denied as moot**.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2010.